Julius Hyman, Appellee, v. Velsicol Corporation et al., Appellants.

Gen. No. 45,256.

Opinion filed January 31, 1951. Rehearing denied February 20, 1951. Released for publication March 13, 1951.

POPPENHUSEN, JOHNSTON, THOMPSON & RAYMOND, and FOLLANSBEE, SHOREY & SCHUPP, all of Chicago, for appellants; FLOYD E. THOMPSON and CLYDE E. SHOREY, both of Chicago, of counsel.

HOPKINS, SUTTER, HALLS, DE WOLFE & OWEN, of Chicago, for appellee; DONALD J. DE WOLFE and WILLIAM G. BLOOD, both of Chicago, of counsel.

MR. JUSTICE KILEY delivered the opinion of the court.

This is an action to restrain the directors of Velsicol Corporation from carrying out a plan of recapitalization and to nullify acts already done pursuant to the plan. A master in chancery recommended a decree dismissing the suit for want of equity. The chancellor sustained exceptions to the master's report and entered a decree in favor of plaintiff. Defendants have appealed.

Plaintiff is a research chemist. In 1930 he was employed by the Pure Oil Company. During the latter

part of 1930 he spoke to defendant Regenstein, his cousin, about inventions he had made in the petroleum field. He wanted capital for exploitation of the inventions. At the time Regenstein was owner of two-thirds of the stock of defendants, Arvey and Transo Corporations, referred to hereinafter as Arvey and Transo. It was decided that the two corporations would provide the capital necessary for plaintiff's purposes.

In 1931 the Velsicol Corporation was organized. Its authorized capital was $20,000 and its authorized stock 200 shares. Arvey and Transo each paid in $8,000 in cash for 80 shares of the stock. Plaintiff assigned two applications for patents to Velsicol in consideration of the issuance to him of the remaining 40 shares. The original Velsicol officers were defendant Regenstein, president, plaintiff Hyman, vice president and F. P. Schneider, secretary-treasurer. The original directors were plaintiff, Regenstein, Schneider, Sidney Blum and Henry Degginger. Schneider was a stockholder in Transo and Blum and Degginger were shareholders in Arvey. In 1940 Degginger was succeeded on the board of directors by defendant A. R. Jameson.

Velsicol's sales increased from $1,021 in 1932 to $4,096,356 in 1945. Except for 1935 ($2,114) it had no net profit until 1940. Beginning in 1940 its net profit before federal taxes ranged from $44,002 to $353,347. Prior to 1939 Transo and Arvey each advanced to Velsicol, for building and operating purposes, $264,000. Non-interest bearing notes covered the advances until January 1, 1944 when two 4% per annum demand notes for $264,000 each were given.

Plaintiff was the managing vice president of the business from its inception. His salary ranged from $40.00 per week in 1931 to $600.00 per week in 1945 and 1946. From 1943 to 1946 he drew expenses of over $8,000.00 per year. In 1943 he sought a greater proportion of stock interest. In 1946 he refused to assign cer-

tain applications for patents covering insecticides, referred to as "1068," to Velsicol until his interest was increased. The dispute over this event resulted in plaintiff's resignation from Velsicol September 13, 1946. Schneider succeeded him in office. On October 15th Velsicol sued plaintiff to compel assignment of the "1068" patent applications. The following day plaintiff resigned as director of Velsicol. In November he brought about the organization of a Delaware corporation to do business in Denver, Colorado, for the manufacture and sale of insecticide "1068". Velsicol's suit to compel assignment of the patent applications covering "1068" was successful (405 Ill. 352).

Early in December the directors of Velsicol decided on a plan of recapitalization for the company. Due notice of a special meeting of the stockholders, to be held December 16, 1946, was given to plaintiff. At the meeting resolutions for the recapitalization program, passed by the directors, were submitted to the stockholders for approval. These decreased the par value of Velsicol stock from $100 to $10 per share and increased the number of shares from 200 to 2000; amended the charter to authorize 100,000 shares of common stock, $10 par value; authorized issuance of 68,000 additional shares to the stockholders so that 70,000 shares would be outstanding, representing $700,000 capital; provided for purchase of these additional shares by cash or "by credit against sums owing by this corporation on outstanding notes"; and that the subscriptions should be paid for in full before 5:00 P.M. on December 27, 1946. The resolutions were approved by the stockholders. Plaintiff did not attend the meeting. His proxy voted against the resolution.

In due course subscription warrants for the pre-emptive rights were issued. Transo and Arvey each surrendered their demand notes and each paid $8,000 in cash to exercise in full their rights for 27,200 shares

each of the additional stock. Plaintiff had the right to subscribe for 340 shares of the $10 par value stock for each share of the $100 par value stock held by him. He did not exercise his rights to purchase the 13,600 shares at $10 per share. He filed this suit on the day fixed by resolution for expiration of the time within which rights had to be exercised.

Plaintiff's suit charged, among other things, that the plan of reorganization was the design of an oppressive majority of stockholders and directors to decrease his interest in Velsicol, was not adopted in the interest of Velsicol but in defendants' interests and was fraudulent and a violation of the fiduciary obligation of the majority. The chancellor confirmed the master's report in most respects. Contrary to the master, however, the chancellor found the plan of recapitalization inequitable and motivated by the desire only to oppress and defraud plaintiff; that the burden of proving the transaction was in good faith and fair rested on defendants; and that they had failed to make that proof. This contrariety is the crux of the case.

██ It is not disputed that the majority stockholders were entitled to control the policy of the corporation, that when plaintiff became a stockholder he agreed to the majority's ruling, that he had notice of the stockholders' meeting and that the resolutions received the requisite vote at the meeting. We think that, if the circumstances justified the recapitalization and if the plan was legal and fair, the questions of defendants' state of mind with respect to plaintiff and as to the effect of the plan on his interests are immaterial.

We consider it unnecessary to decide whether the majority was the fiduciary of the plaintiff in the transactions or whether plaintiff or defendant had the burden of proving good faith and fairness. We think that the plaintiff's testimony shows clearly that the plan

was legal and not unfair and, for the reasons given hereinafter, that the plaintiff is not entitled to the relief sought.

In 1931 plaintiff had the inventions and Regenstein, through Arvey and Transo, had the money. Between 1935 and 1938 a plant was built in Marshall, Illinois and put into operation with more than $500,000 of Arvey's and Transo's money. In 1941 and 1942 plaintiff discussed with Regenstein the capitalization of these loans. After notes were given, covering the loans, plaintiff suggested their capitalization through the issuance of preferred stock. He thought this was a wise tax move. He brought up the subject of capitalization again in 1945 and in 1946. At no time did he have a ''concrete plan''. In early 1946, when Velsicol borrowed money, the First National Bank suggested that the notes be subordinated or capitalized. It is apparent that the idea of recapitalization was common to all concerned.

■ There was no question about the validity of the notes held by Arvey and Transo. Under their terms the holders could demand payment whenever they decided to do so. We cannot see that the position of the note owners was like that of the Federal Reserve Bank in *American Bank and Trust Co. v. Federal Reserve Bank*, 256 U. S. 350. Arvey and Transo had, in 1946, subordinated payment of their notes to facilitate Velsicol's borrowing an additional $675,000. The method of capitalizing the notes was the prerogative of the majority of the directors and stockholders, who in this case were substantially the same because of Regenstein's majority interest in Transo and Arvey corporations. At the stockholders' meeting there was no discussion of the resolutions, yet plaintiff was represented by attorney as proxy. There was no recommendation of a substitute plan of recapitalization, though plaintiff had discussed such a plan with his

attorney. Plaintiff's preferred stock idea was not proposed. Assuming the recapitalization was prudent business, we see no reason for concluding that the method was not sound. We see no reason for deciding that the stock split or new par value was clearly out of line. *Steven v. Hale-Haas*, 249 Wis. 205. What difference did it make to plaintiff that the stock was split and the par value reduced instead of issuing the new stock at the original par?

 We think it must be admitted that the recapitalization was timely. Plaintiff, who had been general manager since the inception of the corporation, had resigned as vice president, as manager and as director. About thirty of the fifty technical employees had left Velsicol with plaintiff to establish the competing Hyman corporation. As a result of these events a reorganization of the management and personnel was necessary. We think that the directors were justified in presenting the plan at the time it was done. This is aside from the question of Velsicol's financial distress, a question argued here but which we need not decide because the reasons given above are sufficient for the conclusion of timeliness.

 At the stockholders' meeting there was no complaint about the stock split, the new par value or the period of time within which pre-emptive rights had to be exercised. Plaintiff does not claim that he was not given his pro rata share of the pre-emptive rights. He says that he had not the $136,000 cash and that defendants knew this fact, and that the unreasonably short period of time between the date of the meeting and the date on which pre-emptive rights expired was designed to oppress him. Notice of the meeting, with copies of the resolutions, was sent to him on December 3rd. He knew he was in a minority position. Had he been interested in attempting to raise the money, he had from the time he received the notice to do so. It is clear

from the record that he was not interested in raising the money. He thought the new management would not succeed. He was "primarily" interested in the newly formed, competing, Hyman corporation. He testified that if he had had the money at the time, he did not know whether he would have exercised his preemptive rights. There is no merit in plaintiff's contention that the par value for the new stock was insignificant compared to the true value. The directors were not required to recommend the stock at a price equivalent to the "true value". Moreover his express attitude renders the contention unimportant.

We have read the cases cited by plaintiff and shall comment on those we think should be distinguished. In *Wood v. MacLean Drug Co.*, 266 Ill. App. 5, there was concealment and misstatement of important facts bearing on the value of stock which directors bought from a minority stockholder for the corporation. In *Southern Pac. Co. v. Bogert,* 250 U. S. 483, plaintiffs were minority stockholders whose pre-emptive rights carried a "prohibitive" price as compared to the price at which Southern Pacific Company got its stock. In *Pepper v. Litton,* 308 U. S. 295, a bankruptcy case, an intricate scheme to defraud creditors was uncovered and the burden was said to be on the dominant stockholders to show good faith. The test was said to be whether under the circumstances the transaction had the earmarks of an "arm's length bargain". In *Lebold v. Inland S. S. Co.*, 82 F. (2d) (C. C. A. 7th) 351, the court said that the majority stockholders were not trustees by mere reason of their majority holdings but that under certain circumstances equity will impose a trustee obligation; that in the purchase of minority shares the sale must be fair to the corporation and all the stockholders; and that the judgment of the majority, in the absence of a trust obligation or fraud on the minority, was not to be interfered with. There a

496

motive to get rid of the minority was admitted. The court said that legal duress, in the absence of fairness, would not be permitted on the part of the dominant shareholders. In *Meinhard v. Salmon,* 249 N. Y. 458, 164 N. E. 545, the court, through JUDGE CARDOZA, said that the trouble with the transaction was that Salmon excluded his coadventurer from any chance to enjoy the benefit made possible by the coadventurer's help at the outset of the venture.

■ We think that the right which plaintiff had to a proportionate share of the new stock issue at the new par value was respected in this case by the issuance to him of the additional stock, arising from the stock split, and the issuance to him of subscription warrants. *Stokes v. Continental Trust Co.,* 186 N. Y. 285, 78 N. E. 1090; Berle and Magill, Corporation Finance, p. 233. By the issuance of the additional stock and the pre-emptive rights to plaintiff he was given the opportunity to protect his pro rata interest in the corporation. The defendants were not to blame for his failure to obtain the money necessary for him to avail himself of his pre-emptive rights. *Scheirich v. Otis-Hidden Co.,* 204 Ky. 289, 264 S. W. 755.

■ It is our conclusion that the reorganization plan, including the price at which the new stock was issued, was not an abuse of the discretion vested in the majority stockholders or directors and was not fraudulently oppressive. *Steven v. Hale-Haas,* 249 Wis. 205, 231. For the reasons given the decree is reversed and the cause is remanded with directions to enter a decree in conformity with the recommendations of the master.

*Decree reversed and cause remanded with directions.*
BURKE, P. J., and LEWE, J., concur.