JOAN ABBY ROMANIK *et al.*, Plaintiffs-Appellants, *v.* LURIE HOME SUPPLY CENTER, INC., *et al.*, Defendants-Appellees.

Fifth District   No. 80-577

Opinion filed April 13, 1982.

Charles C. Hines, of Carbondale, and Gayl S. Pyatt, of Pinckneyville (Twomey and Hines, of counsel), for appellants.

Pat L. Simons, of Popkin, Stern, Heifetz, Lurie, Sheehan, Reby and Chervitz, of Clayton, Missouri, and Richard F. Nash, of Gundlach, Lee, Eggmann, Boyle and Roessler, of Belleville, for appellees.

PRESIDING JUSTICE KARNS delivered the opinion of the court:

This appeal arises from an action brought by the minority shareholders of Lurie's Home Supply Center, Inc., an Illinois corporation, with a business located in East St. Louis, Illinois, against the corporation, its president and majority shareholder, and one of its directors, officers and legal counsel. Plaintiffs sought redress for injuries incurred by the corporation as a result of alleged breaches of fiduciary duty involving various transactions and agreements between the corporation and defendants. Plaintiffs further sought to compel declaration of a dividend and for an accounting for any profits received as a result of the alleged wrongful actions. The circuit court of St. Clair County entered judgment granting partial relief. Specifically, the court declared the following to be void: an amendment to the articles of incorporation authorizing the issuance of 10,000 shares of preferred stock; three loans made by the corporation to the Peter Lurie Revocable Trust totaling $70,913.09; and a $5,000 gift to Edna Lurie, Peter Lurie's widow. The court further awarded plaintiffs $5,000 in attorney fees. Plaintiffs appeal from that order and judgment seeking complete relief as prayed. Defendants cross-appeal,

asserting that the portions of the court's order granting plaintiffs relief were erroneous and seeking a reversal of the order and entry of judgment for defendants, or in the alternative, remandment for new trial.

On January 31, 1958, after existing for some years as a partnership, Lurie's Home Supply, Inc., was incorporated under the laws of Illinois. Stock was issued to three brothers in proportion to their partnership interests with Peter Lurie receiving 50% (850 shares) and Bernard Lurie and Dan Lurie receiving 25% (425 shares) each.

Dan distributed his 425 shares among his children and his wife, Etta, and they, along with Dan, are plaintiffs in the instant case. Defendants are the corporation, Edna Lurie in her capacity as executrix of Peter Lurie's estate, and Ronald Lurie as director, officer and legal counsel to the corporation.

It is undisputed that throughout the existence of the business, before and after incorporation, that of the shareholders, only Peter actively participated in management. Peter directed all corporate activity as the company president and chief executive officer and had maintained a profitable enterprise despite the fact that it was located in an economically depressed area, although no dividend was ever declared since incorporation.

Prior to 1974, the board of directors consisted of five members. Peter was a director from the inception of the corporation until his death in 1977. Bernard was a director from 1958 until his death in 1971, at which time his widow, who had succeeded to his stock interest, became a director. Dan served as a director until 1974. On May 30, 1974, Bernard's widow sold her 425 shares to Peter, making him the owner of 75% of the corporation's stock.

At a special shareholder's meeting on April 17, 1974, the following were elected to the board of directors: Peter Lurie, Edna Lurie (Peter's wife), Robert Lurie (Peter's son), Ronald Lurie (Peter's son), and Jeffrey A. Rosenblum. Shortly thereafter, Edna Lurie and Jeffrey A. Rosenblum resigned as directors and the articles of incorporation were amended to reduce the board's membership from five members to three. The newly assembled board of directors, composed of Peter, Robert and Ronald, named Peter as president, Robert as vice-president and Ronald as secretary and legal counsel. Prior to this time, Dan Lurie had served as corporate secretary.

On June 1, 1974, Peter Lurie entered into two agreements with the corporation, a lease and an employment agreement.

In 1968 Peter Lurie purchased the building and underlying property where Lurie's Home Supply, Inc., is located for $125,000. He purchased the property from a third party from whom the company had leased the

premises at an annual rental of 2½% of gross sales in excess of $41,666.67 monthly after certain adjustments with a minimum of $12,500 per year. From this time until June 1, 1974, Peter leased the premises to the corporation pursuant to an oral agreement. As best we can determine from the record, the terms of the oral lease called for an annual rent of 2½% of gross sales in excess of $50,000 monthly with a minimum of $15,000 per year. The aggregate rentals for fiscal years 1975 and 1974 were $32,769 and $26,439, respectively. The corporation, as lessee, paid all utility costs on the leased premises. On June 1, 1974, the corporation entered into a written five-year lease with Peter Lurie as lessor, requiring a fixed monthly rental of $3,000. In addition the company paid all assessed taxes, insurance, maintenance, and utility charges on the leased premises.

On June 1, 1974, the corporation entered into an employment agreement with Peter Lurie, who was then 69 years old. The agreement provided for a five-year term, with an option for renewal exercisable by Peter, paying $54,600 annually, an amount which could be increased but not decreased. This represented a $15,000 increase over Peter's 1973 salary. The agreement provided for deferred compensation in the event of Peter's retirement, disability or death. In the event of his retirement or disability, he would receive 60% of his base salary subject to cost of living increases. In the event of his death, the payments would be made directly to his estate. The deferred compensation payments would continue for a period of 10 years. The agreement also contained a provision requiring Peter's consent before the company declared a dividend.

On December 3, 1975, plaintiffs filed a complaint against defendants seeking to have the following declared null and void: the lease agreement between the corporation and Peter Lurie; the salary increase pursuant to the employment agreement with Peter Lurie; and Peter Lurie's purchase of stock from the estate of Bernard Lurie. The complaint further sought to enjoin the corporation and Peter Lurie from contracting in the future and to compel declaration of a dividend.

On January 25, 1977, a plan to recapitalize the corporation was submitted by the board of directors and thereafter approved by the shareholders. The amended articles of incorporation were properly filed on February 14, 1977. The amendment provided for the authorization of 10,000 shares of callable preferred stock which were subject to the terms and conditions of a consulting agreement to be executed between the corporation and Peter Lurie. The holders of the preferred stock were to receive a dividend preference on the first $1,000 of cash dividends declared and were entitled to one vote per share on any action requiring shareholder participation and approval. The shares contained transfer restrictions limiting the holders to transfer only to lineal descendants. In

addition, the amendment eliminated preemptive rights for all classes of corporation stock.

On April 8, 1977, a consulting agreement, as referred to in the February 14, 1977, amendment, was presented to the board of directors at its annual meeting. The agreement provided that upon Peter Lurie's retirement from his employment as president of the company, that he would continue to perform "consulting duties" for the corporation. As consideration for the execution of the agreement and performance of consulting duties, the company would transfer to him 5,000 shares of the newly authorized preferred stock. The agreement further provided that if Lurie failed to perform the consulting duties, that he should forfeit all rights and interest in the 5,000 shares of preferred stock. This agreement was not signed by the company or by Peter Lurie individually.

At the April 8, 1977, meeting a resolution was passed authorizing the issuance of the 10,000 shares of preferred stock to Peter Lurie "in consideration for his past services to the company and in order to assure itself of retaining his continuing services as a consultant subsequent to his retirement." Peter Lurie died on May 16, 1977, prior to retiring and, thus, prior to performing any consulting duties. One week after Peter Lurie's death, the remaining directors (Ronald Lurie and Robert Lurie) authorized a $5,000 death benefit to Peter's widow, Edna.

On June 3, 1977, plaintiffs filed an amended complaint in which they prayed that the recapitalization amendment be declared null and void and that the corporation be enjoined from issuing the preferred stock in accordance with the amendment, or, in the alternative, that the corporation be required to rescind any such issuance.

Between February 16, 1978, and February 8, 1979, the corporation made three loans to the Peter Lurie Revocable Trust of $53,988, $5,571.04, and $11,353.05, respectively, to pay Peter Lurie's estate taxes. These were short-term loans made on unsecured promissory notes bearing an 8% interest rate. The latter two loans were made while the former remained delinquent and past due.

On February 22, 1979, plaintiffs' final amended complaint was filed. The complaint restated the counts previously filed and further sought to enjoin the corporation from issuing any additional loans to the Peter Lurie Revocable Trust and requesting that the outstanding notes be immediately called for payment. Plaintiffs further prayed for other and further relief as the court deems equitable and proper.

Following trial, the court entered the following order:

"This matter coming before the Court and the Court being fully advised in the premises, does find that the following actions taken by or on behalf of the Defendant, Lurie Home Supply Center, Inc.,

by its directors, to be contrary to law and the same are hereby declared void:

1. The amendment to the Articles of Incorporation dated January 26, 1977 authorizing the issuance of 10,000 shares of preferred stock;

2. The $5,000 gift made by the corporation to Edna Lurie;

3. The loan of $53,988 made to the Peter Lurie Revocable Trust on February 16, 1978;

4. The loan of $5,571.04 made to the Peter Lurie Revocable Trust on February 6, 1979;

5. The loan of $11,353.05 made to the Peter Lurie Revocable Trust on February 8, 1979.

IT IS THEREFORE ORDERED that the Defendants repay to the corporation the sum of Seventy-Five Thousand Eight Hundred Seventy-Eight Dollars and Nine Cents ($75,878.09) instanter, and further that the sum of Five Thousand Dollars ($5,000) be assessed against the defendants as and for reasonable attorneys' fees incurred in the prosecution of this cause. Judgment is hereby entered in favor of the Plaintiffs and against the Defendants in said sums plus costs of court."

On appeal, plaintiffs assert that the trial court erred in failing to grant complete relief as prayed. Specifically, plaintiffs assert that all of the transactions, as described above, should be declared null and void and transactions completed should be rescinded with the benefits therefrom to be recouped by the corporation. Plaintiffs further argue that the trial court erred in failing to compel declaration of a dividend and to make an award of attorney fees as requested. In their cross-appeal, defendants assert that the trial court erred in declaring null and void the amendment to the articles of incorporation authorizing the preferred stock, the loans from the corporation to the Peter Lurie Revocable Trust, and the death benefit to Edna Lurie.

*Employment Agreement*

Plaintiffs assert that in entering into the employment agreement, Peter Lurie breached his fiduciary duty as an officer and director of the corporation in that the agreement amounted to an exploitation of his corporate position to obtain corporate funds and was beyond mere bad business judgment. Plaintiffs challenge the following provisions of the employment agreement: the salary increase, the deferred compensation, and the dividend restriction.

Plaintiffs argue that the salary increase given to Peter Lurie when he was 69 years old was excessive in that there was no possibility that the

corporation would get a fair return on its investment. They argue that there are no new duties or expertise involved but only more money; that the salary increase was unnecessary to retain Peter's services; and that the board of directors should have consulted disinterested advisors for an independent appraisal. Defendants contend that the compensation was reasonable and that the amount was determined after investigation into salaries of presidents of comparable companies. Defendants state that the purpose of the salary increase was to acknowledge Peter's contribution to the company and to insure continued services.

■■ Whether compensation is reasonable is a question of fact. The factors to be considered in making such determinations include, *inter alia*, the employee's ability, quantity and quality of services he renders, the time he devotes to the company, the difficulties involved and responsibilities assumed in his work, the success he has achieved, profitability due to his efforts, the company's financial condition, and the compensation paid for comparable work by similar companies. (2 F. O'Neal, Close Corporations, ch. 8, at 100-101 (2d ed. 1971).) Although no generally accepted rule exists as to which party bears the burden of proof on the issue of reasonableness of compensation, when self-dealing is involved the recipient of the compensation has the burden. (See *Santarelli v. Katz* (7th Cir. 1959), 270 F.2d 762.) In the instant case, at the time the employment agreement was entered into, Peter Lurie was a director and officer of the corporation, owned 75% of the corporation's stock, and the other directors were members of his immediate family. Considering these facts, Peter Lurie bore the burden of showing the reasonableness of the compensation. Implicit in the trial court's inaction with regard to the employment agreement is a finding that the compensation was reasonable and that defendants had met this burden. Therefore, on appeal, we will reverse that finding only if it is contrary to the manifest weight of the evidence.

■■ In the instant case, defendants presented the expert testimony of a certified public accountant who had directed the audits of the corporation. Hoops, the accountant, testified as to the reasonableness of the compensation for the purposes of allowing a business deduction to the corporation. He further testified as to the tax effects of the compensation and the relevant tax bracket of the corporation to show the actual costs to the corporation. Plaintiffs argue that this testimony lacks probative value and is irrelevant as to the fairness of the employment agreement. While we can find no Illinois case on this issue, we agree with courts of other jurisdictions that have found the effect of taxes on the income of the individual, as well as on the income of the corporation, is properly to be considered in determining the reasonableness of salaries paid. (See *Black v. Parker Manufacturing Co.* (1952), 329 Mass. 105, 106 N.E.2d 544; *Riddle v. Mary A. Riddle Co.* (1948), 142 N.J.Eq. 147, 59 A.2d 599.) To

hold otherwise would ignore the practicalities of modern business planning.

■■ Generally, unless the majority shareholders and directors are clearly managing the affairs of the corporation dishonestly or the compensation is so unreasonable as to constitute "waste" or "spoliation", courts have not substituted their judgment for that of the directors. (2 F. O'Neal, Close Corporations, ch. 8, at 101 (2d ed. 1971).) While we believe that this approach constitutes an exaggerated judicial deference to the business judgment of directors (see *Executive Compensation Close Corporations: The Need for a Modified Judicial Approach to the Reasonableness Test*, 1972 Duke L. J. 1251, 1253), in the instant case we find sufficient evidence to support the finding of reasonable compensation. It is undisputed that Peter Lurie had devoted his full-time effort to the company for almost 30 years and that the business had prospered despite the fact that it was located in a depressed area. We further note that Ronald Lurie, Peter's son and the corporation's legal counsel, testified that the corporation was in the 50% tax bracket and that the actual cost to the corporation was only half of the $54,600 salary because of the determination by the Internal Revenue Service that the compensation was reasonable for the allowance of a business deduction. Therefore, considering the evidence on the whole, the finding of reasonable compensation was not contrary to the manifest weight of the evidence.

Plaintiffs apparently argue that the deferred compensation provision of the employment agreement provided excessive benefits to Peter Lurie or his estate. The substance of the deferred compensation section provided that, upon termination of employment by retirement, disability or death, that Peter Lurie, or his estate, should receive 60% of his base compensation during the year of termination with such salary to continue for 10 years with cost-of-living increases.

■■ In Illinois, corporations have the power to establish deferred compensation plans. (Ill. Rev. Stat. 1979, ch. 32, par. 157.5(o).) A salary continuation agreement is a common feature, in one form or another, of corporate executive compensation. (*Galler v. Galler* (1964), 32 Ill. 2d 16, 203 N.E.2d 577.) In *Galler*, the Illinois Supreme Court sustained a five-year salary continuation for the benefit of the widow of a corporate executive against an attack that it was an *ultra vires* gift of corporate property. The court noted that there were no shareholders, other than the parties to the contract, to complain and thus the objection was inapplicable. However, in the instant case the plaintiffs do have standing to complain; therefore, we must look to the legality of the payments. The legality of pension benefits based in whole or in part on past services has been recognized so long as the benefits "redound to the profitmaking power of the corporation." The modern trend is to uphold expenditures even though the

corporate benefits therefrom are indirect or even conjectured. (2 F. O'Neal, Close Corporations, ch. 8, at 92 (2d ed. 1971).) The following passage from O'Neal seems particularly appropriate to the instant case:

> "One of the subtle dangers in a close corporation is the aging of the principal shareholder-officers. The rugged individualists who are responsible for the success of a closely-held enterprise are often reluctant to relinquish control. Any device which encourages their timely retirement is for the ultimate 'profitmaking' of the company." (2 F. O'Neal, Close Corporations, ch. 8, at 93 (2d ed. 1971).)

In the instant case, if Peter Lurie had voluntarily retired or become disabled, the 10-year salary continuation, at 60% of his base pay, would have been a reasonable pension considering his service to the corporation. However, in that Peter Lurie died with the payments inuring to the benefit of his estate, we find the 10-year period to be unreasonable and therefore reduce it to five years.

The final issue raised with regard to the employment agreement involves the dividend restriction. The agreement provides that Peter Lurie's consent be required prior to a declaration of a dividend. Plaintiffs argue that the provision takes away the legal right of the minority shareholders to have certain business affairs, in this case the payment of a dividend, decided by the board of directors and is therefore invalid. (Ill. Rev. Stat. 1979, ch. 32, par. 157.41.) Defendants contend that, because the deferred compensation benefits are unsecured by collateral, the corporation agreed that it would not pay dividends during the five-year period of the employment contract without Peter Lurie's consent.

While there may be merit to plaintiffs' argument as to the invalidity of the dividend restriction, we find it unnecessary to reach that issue as this power was personal to Peter and he has died. The record reveals that there was no occasion in which Peter Lurie was called upon to give his consent to the declaration of a dividend. The only evidence adduced with regard to dividends is that none have ever been declared during the life of the corporation.

*Lease*

■■■ Directors and officers of a corporation occupy a fiduciary relationship with the corporation. This fiduciary position imposes certain duties on the directors and officers in their management of the corporate business which include the duty to exercise prudent care, skill and judgment and the duty to act with undivided loyalty. (*Patient Care Services, S.C. v. Segal* (1975), 32 Ill. App. 3d 1021, 337 N.E.2d 471.) Where a director or officer transacts business with the corporation, the duty of undivided loyalty requires that the transaction be fair and places the burden of

demonstrating fairness on the director or officer. *Schlensky v. South Parkway Building Corp.* (1960), 19 Ill. 2d 268, 166 N.E.2d 793.

On appeal, plaintiffs argue that the trial court erred in failing to set aside the lease transaction and to order an accounting for profits because defendants did not sustain their burden of establishing the fairness of the lease transaction. We agree.

■■ Initially, we recognize that the lease transaction was an interested director transaction. It is undisputed that Peter was an officer and director of the corporation and dominated its affairs when he, as owner of the property, executed the lease with the corporation. The issue is whether the challenged lease was fair to the corporation when it was executed in 1974. In order to assess the fairness of the lease transaction, it is necessary to consider the following factors: whether the transaction was at market price, the corporation's need for the property, whether the corporation could have obtained a better bargain in dealing with others, the possibility of corporate gain being diverted by the director, and whether full disclosure was made to the other directors and shareholders. *Schlensky v. South Parkway Building Corp.* (1960), 19 Ill. 2d 268, 166 N.E.2d 793.

The purchase of the property by Peter Lurie in 1968 and the oral lease to the corporation prior to June 1, 1974, are not being challenged by the minority shareholders. It appears that the terms of the oral lease were similar to the terms of the lease from the previous owners of the property. Prior to June 1, 1974, Peter leased the building to the corporation for 2½% of gross sales in excess of $50,000 per month after certain adjustments with a minimum yearly rental of $15,000. According to the terms of the lease with the previous owners, the corporation paid 2½% of gross sales in excess of $41,666.67 per month after certain adjustments with a minimum yearly rental of $12,500.

The terms of the 1974 lease, however, differed substantially from the previous lease terms. The rental price was set at $36,000 per year and was no longer contingent on the amount of sales. In addition, the corporation was charged with the payment of all taxes and insurance on the property and the maintenance of the interior and exterior of the building. According to the terms of the lease with the previous owners, the corporation was charged only with any increases in the 1955 taxes and insurance and the maintenance of the interior of the building. Hoops, an accountant with the firm that prepared the corporation's financial statements, testified for defendants that the net cost, over a four-year period of the new lease, as compared to the old lease, was $25,000 considering the corporation's incremental tax rate.

The terms of the lease do not indicate perforce overreaching by Peter. The fairness of the transaction, however, cannot be determined in a

vacuum. On March 30, 1974, one month prior to execution of the challenged lease, Peter acquired 75% ownership of the outstanding shares of corporate stock. Ronald, who prepared the lease, testified that the rental price was determined after consideration of the costs incident to relocating, the availability of similar property in East St. Louis and the rental price of comparable properties in East St. Louis. No evidence was introduced, however, as to what the prevailing rental rates for similar properties located in East St. Louis were. Ronald, testifying as a section 60 witness, stated that prior to the execution of the lease, a real estate appraiser valued the property at $41,000. Hoops testified that at the time his accounting firm prepared that year's financial statement, the firm had no reason to believe that the rental price was unreasonable. Plaintiffs' expert, an accounting professor at Southern Illinois University, whose expertise was questionable, testified that a reasonable rental price for property valued at $41,000 would be $12,000 per year. Defendants urge that the opinion stated by plaintiffs' expert should be discounted because he failed to consider the fact that Peter purchased the property in 1968 for $125,000. The appraisal value at the time the lease was executed, however, is more pertinent to the reasonable rental value than the purchase price six years earlier. It is difficult to comprehend the fairness of Peter's lease of property valued at $41,000 to the corporation for a yearly rental of $36,000. A fair inference from the evidence presented at trial was that Peter was shifting the burden of his poor investment, in property which had diminished substantially in value, to the corporation, and, thereby, diverting corporate gain for his own benefit.

In his testimony, Ronald stressed the importance of the corporation remaining located at 301 Collinsville Avenue in terms of the goodwill generated from that location for over 20 years and the costs incident to relocating. The corporation's need for the property, however, does not justify the excessive rental price. The minutes of the special meeting held on April 30, 1974, indicated that the lease was approved and adopted by the board of directors. Dan, the minority shareholder, was no longer a director and was not informed of the terms of the lease prior to its execution. Upon learning of those terms, Dan objected to the lease.

Viewing the evidence as a whole, we conclude that the trial court's finding that defendants sustained their burden of proving the fairness of the lease is against the manifest weight of the evidence. We hold that defendants breached the fiduciary duty owed to the corporation, and, therefore, must account for profits realized on the lease transaction. On remand, the trial court should determine the fair rental value of the property from the date of the lease, June 1974, to the present.

*Preferred Stock Transaction*

■■ The trial court ordered that the amendment to the articles of incorporation, authorizing the 10,000 shares of callable preferred stock and eliminating preemptive rights, be declared null and void. On appeal, defendants argue that the transaction was regular on its face and in the best interests of the corporation. Specifically, defendants argue that the amendment benefited the corporation in two primary ways. First, by making the shares subject to the consulting agreement between Peter Lurie and the corporation, it assured itself of retaining Peter's expertise at no cost to the corporation because no cash payments would be made in return for Peter's consulting services. Second, by providing the corporation with a tax deduction which would reduce its tax payments it thereby benefited all shareholders. Defendants further note a related concern of continuity of management. Robert Lurie was the only family member, other than Peter, who had been involved in the day-to-day management of the company and, in fact, Robert became president after Peter's death. Defendants argue that the elimination of preemptive rights benefited the corporation in that the corporation could issue stock to Robert in partial payment for his full-time services thereby minimizing cash outlays. Defendants admit that the authorization and the issuance of the preferred stock would impact adversely on the interests of the minority shareholders in the event of a declaration of a dividend or liquidation of the company.

Defendants cite *Kimmel v. Gray* (1915), 196 Ill. App. 406, and *Hyman v. Velsicol* (1951), 342 Ill. App. 489, 97 N.E.2d 122, for the proposition that closely held corporations commonly amend their articles of incorporation to create a new class of stock to serve corporate interests. We agree that a closely held corporation can recapitalize for valid business reasons and, after reviewing the reasons given, we will not interpose our judgment for that of the board of directors in the instant case.

However, we find that the issuance of the 10,000 shares to the Peter Lurie Revocable Trust was improper, and therefore we order divestiture of the shares and a return of them to the corporation to be issued, if at all, for valid consideration. Defendants admit that the preferred shares were restricted and made expressly subject to the terms of the consulting agreement between Peter Lurie and the corporation. The shares were to be consideration for the performance of consulting duties by Peter. Plaintiffs argue, and the record reveals, that the consulting agreement was never signed, Peter never retired and thus no consulting duties were ever performed. Nevertheless, the entire 10,000 shares (the consulting agreement called for 5,000) were issued to the Peter Lurie Revocable Trust. We further note that the consulting agreement contained a clause requiring

the forfeiture of the 5,000 shares for failure to perform the consulting duties.

In light of the foregoing, we therefore order that the Peter Lurie Revocable Trust be divested of the 10,000 shares of preferred stock and that the shares be returned to the corporation.

## Death Benefit

Shortly after Peter Lurie's death, the remaining directors (Ronald and Robert) authorized payment to Peter's widow, Edna, of a $5,000 death benefit. Plaintiffs argue that this is further evidence of defendants' "oppressive tactics" and was not required by the employment agreement. Although it is not articulated, we assume that plaintiffs are also attacking the payment as *ultra vires* and a giving away or wasting of corporate assets. The trial court voided the death benefit.

After the death of a corporate executive or other key employee, corporate directors commonly authorize benefits to widows that are not required by the employment contract. (2 F. O'Neal, Close Corporations, ch. 8, at 118 (2d ed. 1971).) O'Neal further states that, in the absence of statutory authorization for such death benefits,

"\* \* \* courts should sustain such payments against attacks by minority shareholders, if the payments are reasonable in amount, and the directors have exercised an honest and reasonable business judgment in granting them." 2 F. O'Neal, Close Corporations, ch. 8, at 119 (2d ed. 1971).

In the instant case, while we recognize that the directors who authorized the death benefit were the sons of the recipient, the amount of the benefit was clearly reasonable. Other than plaintiffs' argument that the payment was part of an "oppressive scheme," there is no evidence that the directors did not exercise honest and reasonable business judgment in authorizing payment. Therefore, we find that the trial court erred in voiding the death benefit in that it was duly authorized and reasonable in amount.

## Loans

In their cross-appeal, defendants contend that the trial court erred in declaring the loans made by the corporation to the Peter Lurie Revocable Trust void and in ordering defendants to repay the loans. In this regard, defendants initially argue that the trust and trustees were indispensable parties, and, therefore, plaintiffs' failure to join them requires dismissal of that part of the action based on the loans. We find that the trust and trustees were not indispensable parties. The basis of plaintiffs' cause of action is that defendants, as officers and directors of the corporation,

breached the fiduciary duties owed by them to the corporation. Assuming that the loan transactions constituted a breach of duty, complete relief can be afforded plaintiffs by holding defendants personally liable to the corporation for the amounts of the notes until the notes are repaid by the trust. Therefore, it is unnecessary to declare the loans void and to consider the possibility of affecting the rights of persons not joined as parties to the litigation.

■■ Defendants next argue that the weight of the evidence was that the loans were proper, interest-bearing investments within the lawful discretionary authority of the board of directors. We have examined the several cases cited by defendants in support of the proposition that a corporation has the power to lend money. That a corporation has the power to lend money, however, is not in dispute. The issue is whether defendants breached the fiduciary duties owed to the corporation in causing the three loans to be made to the trust. Directors must exercise that degree of care and prudence that men prompted by self-interest exercise in the management of their own affairs. A director, however, will not be held liable for mere errors in judgment as long as the decision does not involve fraud, illegality or conflict of interest. *People ex rel. Illinois Racing Board v. Blackhawk Racing Association* (1979), 78 Ill. App. 3d 260, 397 N.E.2d 134; *Shlensky v. Wrigley* (1968), 95 Ill. App. 2d 173, 237 N.E.2d 776.

All three promissory notes were issued to the Peter Lurie Revocable Trust for the purpose of paying Peter's estate taxes. The notes were unsecured. The first note, dated February 16, 1978, was for the principal sum of $53,988 with the interest rate stated at 8% per annum. It was undisputed that the current prime interest rate was 8%. We conclude that the evidence was insufficient to establish that the directors deviated from the requisite standard of care in issuing the first promissory note.

The second and third promissory notes were both issued at 8% interest and were both payable on November 1, 1979. The notes were dated February 6, 1979, and February 8, 1979, and were issued for the principal sums of $5,571.04 and $11,353.05, respectively. Ronald testified that the interest rates were low and that the current prime interest rate was about 10 or 10½%. Ronald stated that he had prepared the notes by referring to the first note and had not realized that the interest rate was only 8%. Ronald admitted that issuance of the loans at an interest rate lower than the prevailing interest rate caused harm to the minority shareholders. Although payment on the first note was overdue at the time the subsequent notes were issued, these notes were unsecured. In addition, the terms of the latter two notes were clearly beneficial to the interests of a majority shareholder at the expense of the corporation, and, hence, the directors' decision involved a conflict of interest. (See 2 F. O'Neal, Close

Corporations, ch. 3, at 129 (2d ed. 1971).) Therefore, we hold that the trial court's finding that the directors breached their duties toward the corporation in issuing the second and third promissory notes was not against the manifest weight of the evidence and these loans should be repaid at the then prevailing interest rate.

Finally, we note that section 42.4 of the Illinois Business Corporations Act provides the following:

> "The directors of a corporation who vote for or assent to the making of a loan to an officer or director of the corporation shall be jointly and severally liable to the corporation for the amount of such loan until the repayment thereof." (Ill. Rev. Stat. 1979, ch. 32, par. 157.42—4.)

It was undisputed that the purpose of the loans was to pay Peter's estate taxes. Peter was a director and officer of the corporation during his lifetime. The loans, however, were made to the Peter Lurie Revocable Trust and not to Peter individually. No evidence was introduced as to the terms of the trust or the beneficiaries under the trust. Therefore, we are unable to conclude that the loans to the trust were, in effect, a prohibited loan to an officer or director. On remand, the court may determine that these were prohibited loans (Ill. Rev. Stat. 1979, ch. 32, par. 157.41b) and that the directors voting for or assenting to these loans are liable as provided in section 42.4.

### Dividends

Plaintiffs contend that the trial court erred in failing to compel the board of directors to declare a dividend because legal funds were available and the board's refusal to declare a dividend was arbitrary and unjustifiable.

■■ The decision concerning the declaration of a dividend where a legal dividend fund is available rests within the sole discretion of the board of directors. Courts are reluctant to interfere with the exercise of the directors' business judgment unless the withholding is fraudulent, oppressive or totally without merit. *Hofeller v. General Candy Corp.* (1934), 275 Ill. App. 89.

In support of the argument that the withholding of dividends was oppressive, plaintiffs stress the fact that no dividends have been declared since the time Peter acquired 75% ownership of the corporate stock. This argument ignores the important fact that no dividends have been declared in the history of the corporation.

Ronald testified that there were several business reasons for the board's decision to not declare dividends. These reasons were as follow: the purchase of a warehouse, the expansion of inventory and the possi-

bility that the company might have to finance its own inventory. We conclude that the trial court's finding that the directors' decision to retain earnings was not an abuse of their discretion is supported by the evidence.

### Attorney Fees and Punitive Damages

■■ Plaintiffs assert that the trial court erred in limiting recovery of attorney fees to $5,000 where the record reveals such expenses to be in excess of $32,000. Considering the nature and extent of the litigation and the substantial benefit to the corporation, we find the $5,000 to be unreasonably low and therefore, on remand, the trial court should determine and assess reasonable attorney fees. See *Ross v. 311 North Central Avenue Building Corp.* (1970), 130 Ill. App. 2d 336, 264 N.E.2d 406; *Bingham v. Ditzler* (1943), 320 Ill. App. 88, 49 N.E.2d 812.

Plaintiffs' final assertion is that the trial court erred in failing to award punitive damages to plaintiffs in that the actions of defendants evince a fraudulent abuse of discretion, a willful, wanton and malicious breach of fiduciary duty as to justify punitive damages. (*Zokoych v. Spalding* (1976), 36 Ill. App. 3d 654, 344 N.E.2d 805.) However, in the instant case, we find no actions or circumstances to justify such an award.

Therefore, the judgment of the circuit court of St. Clair County is affirmed in part, reversed in part, and remanded with directions for determinations consistent with the views expressed herein.

Affirmed in part; reversed in part; and remanded with directions.

KASSERMAN and JONES, JJ., concur.