SMITH-SHRADER COMPANY, INC., *et al.*, Plaintiffs-Appellees and Cross-Appellants, v. ROBERT S. SMITH *et al.*, Defendants-Appellants (Saunders Valve, Inc., *et al.*, Defendants and Cross-Appellees; Conbraco Industries, Inc., Defendant).

First District (1st Division)   No. 83—2500

Opinion filed August 19, 1985.—Rehearing denied October 4, 1985.

Shepp & Hellman and William J. Harte, Ltd., both of Chicago (William J. Harte, of counsel), for appellants.

Coles & Griffin, Ltd., of Chicago (Arthur M. Solomon, Lois Solomon, and Evan M. Kjellenberg, of counsel), for appellees Smith-Shrader Company, Inc., and Earl C. Shrader.

JUSTICE CAMPBELL delivered the opinion of the court:

Plaintiffs, Earl C. Shrader (Shrader) and Smith-Shrader Company, Inc. (S-S), filed a six-count complaint against defendants, Robert S. Smith (Smith), R.S. Valve Corporation (R.S. Valve), Conbraco Industries, Inc. (Conbraco), Saunders Valve, Inc. (Saunders Valve), and William Reid (Reid), alleging breach of fiduciary duty, tortious interference with contract, common law conspiracy, unfair competition, and Federal and State antitrust violations. Smith filed a counterclaim seeking dissolution of S-S and an accounting. During pretrial proceedings, the court dismissed Conbraco as a defendant by agreed order, dismissed the Federal antitrust and common law conspiracy counts, and granted summary judgment to Saunders Valve and Reid on the remaining counts. Following plaintiffs' case in chief, the court further granted defendants'[1] motion for a directed verdict as to the State an-

---

[1]For the purposes of this opinion, the term "defendants" shall hereinafter refer to Smith and R.S. Valve only.

titrust count. At the conclusion of the bench trial, the trial court found for plaintiffs on all counts and ordered an accounting on all profits earned by R.S. Valve since February 1, 1981; imposed a constructive trust on those profits; enjoined defendants from doing business with any former customers of S-S until 1990; ordered Smith to repay any compensation he had received from S-S since February 1, 1981, and assessed attorney fees and punitive damages against Smith, individually. In addition, the court denied Smith's counterclaim for dissolution of S-S.

On appeal, defendants contend that: (1) the trial court erred in concluding that Smith had breached his fiduciary duty as officer, director and shareholder of S-S; (2) the trial court's finding that Smith tortiously interfered with the contractual relations of S-S was against the manifest weight of the evidence; (3) the trial court improperly awarded punitive damages and attorney fees; (4) the trial court erroneously ordered Smith to repay compensation received from S-S since February 1, 1981; and (5) the trial court erred in denying Smith's counterclaim. Plaintiffs filed a notice of cross-appeal regarding the trial court's order granting summary judgment to Reid and Saunders Valve.[2] For the following reasons, we affirm the trial court's judgment.

The record discloses that S-S was engaged in business as a manufacturers' representative for companies which produced industrial valves, fittings and related products. In this capacity, S-S received sales commissions from its client companies based upon the volume of products S-S sold to wholesalers and distributors in the industry. Shrader and Smith each owns 50% of the stock of S-S and prior to Smith's resignation, received equal salaries and equal contributions to their profit sharing accounts.

For approximately 23 years prior to April 1981, Shrader and Smith had been business associates, first as partners, then as the two principal officers, directors and sole shareholders of S-S. The record indicates that for many years prior to 1981, Shrader and Smith had disagreements as to how the business should be run. Eventually, these disagreements culminated in Smith's resignation in April 1981, as officer, director and employee of S-S, and formation of R.S. Valve, a competing business. However, Smith remains a 50% shareholder of S-S.

[2]We have been advised by correspondence from counsel for plaintiffs, with due notice having been given to counsel for defendants, that the cross-appeal was dismissed by stipulation of the parties and agreed order.

Prior to Smith's resignation, S-S represented, under contract, the product lines of five principal manufacturers: Conbraco, Saunders Valve, Hollaender Manufacturing, Inc., Mohawk Valve, Inc., and Mephisto. In addition to those manufacturers under contract, S-S also promoted the products of Burke Stainless Steel Paint, Westran and Clow. Prior to Smith's resignation, Smith, Shrader, Fred Fahlstrom, Bill Nemanich and Charles Shrader comprised the outside sales force of S-S, and Lorraine Jones and Renee Mutschler were employed as secretaries and inside client contacts.

The pertinent facts which plaintiffs contend support their cause of action are as follows. In February 1981, Smith, while acting on behalf of S-S, attended the annual Conbraco sales meeting. In his evidence deposition, Carl Mosack, president of Conbraco, stated that Smith told him at the sales meeting that he was planning to resign from S-S and asked Mosack if he could have Conbraco coverage. Mosack told Smith that that decision had to be made by John Yopp, Conbraco's national sales manager. Although Mosack stated that he had not placed much importance on Smith's statement about leaving S-S, apparently he placed enough importance on it to discuss changing manufacturers' representatives with Yopp, despite the fact that Mosack thought that S-S had done a "good job" as Conbraco's representative.

Charles Eastman, former vice president of marketing and sales for Saunders Valve, stated in his evidence deposition that he had worked for Saunders Valve from March 1, 1980, through July 31, 1981, and reported directly to Loren Casper, president of Saunders Valve. Pursuant to a written contract, S-S represented Saunders Valve's products in the Chicago territory. In February or March 1981, Eastman discussed S-S's representation of Saunders Valve with Casper, advising that a change in representatives be made due to a drop in sales performance. Casper told Eastman to wait until after the Petrochemical Show in April 1981, because he had heard that Smith would be "doing something" in Chicago. Toward the end of March 1981, Casper told Eastman in confidence that Smith was going out on his own and had requested the Saunders Valve line. Smith had also told Casper that William Reid, Bill Nemanich and Lorraine Jones would be joining his new business.

Eastman further stated that in conversations he had had with Smith at the Petrochemical Show in April 1981, Smith reiterated that Reid, Nemanich and Jones would be joining him. In mid-April, when Eastman asked Casper what the latest developments were regarding Smith, Casper stated that if Conbraco went with Smith, Saunders Valve would also give Smith a chance. Casper then telephoned John

Yopp of Conbraco and asked him if Conbraco planned to terminate its contract with S-S. Although Yopp said he had not yet decided, when Casper hung up the telephone, he told Eastman that Saunders Valve would go with Smith. Later that week when Eastman asked Smith about his break with S-S, Smith said that, under the advice of his attorney, he could not talk about it until after April 24, 1981, the effective date of his resignation. In May, Saunders Valve terminated its contract with S-S and entered into an agreement with R.S. Valve.

William Reid, sales representative for R.S. Valve, testified that in May 1981, Smith talked to Reid about joining him in a new business and further stated that he had information that Conbraco was going to terminate its contract with S-S. Reid agreed to join Smith and thereafter approached Bill Nemanich, Lorraine Jones and Renee Mutschler, S-S employees, about joining R.S. Valve. Reid denied that Smith had asked him to solicit their employment and claimed that Smith did not have knowledge that Reid had done so until after the initial contacts had been made.

Lorraine Jones testified that she met Reid for lunch on June 15, 1981, to discuss an employment opportunity with R.S. Valve. Reid told Jones to contact Smith if she was interested because, due to legal problems, Smith could not contact her directly. Later that month, Reid called Jones at S-S and asked for the telephone numbers of Nemanich and Mutschler.

Renee Mutschler testified that Reid contacted her after Smith's resignation and told her that Smith had indicated to Reid that he would like to have Mutschler working for R.S. Valve. Both Jones and Mutschler chose to remain with S-S.

William Namanich, former sales representative for S-S, currently working in the same capacity for R.S. Valve, stated that he did not learn of Smith's resignation until after the effective date. In mid-May, Reid contacted him regarding employment with R.S. Valve. Namanich stated that he had been contemplating leaving S-S before the offer from R.S. Valve because he had heard that Shrader's son would be assuming control of the company. Prior to Nemanich's meeting with Reid, he learned that Conbraco had terminated its contract with S-S. Nemanich resigned from S-S in mid-June, and joined R.S. Valve on July 1, 1981.

Fred Fahlstrom, former sales representative for S-S, currently working in the same capacity for R.S. Valve, testified that he learned of Smith's resignation in late April when he received a copy of Smith's resignation in the mail from an anonymous source. In early June 1981, after Conbraco had notified S-S that it was cancelling its

contract, Fahlstrom discussed his future at S-S with Shrader. Fahlstrom was particularly concerned because 90% of his income had been attributable to commissions earned on sales of Conbraco's products. Shrader told Fahlstrom that he could not promise him anything definite, but felt that S-S could employ him at least until the end of the year. Because of the instability of his future employment with S-S, Fahlstrom contacted Smith about employment with R.S. Valve. No one from R.S. Valve had contacted him. Fahlstrom joined R.S. Valve on August 1, 1985.

Smith testified that prior to his resignation, S-S had represented Conbraco for approximately 23 years, Saunders Valve for 5 years, and Mohawk Valve for 3 years, and that Conbraco had represented approximately 70% of S-S's gross commissions. Currently, R.S. Valve represents Conbraco, Saunders Valve, Mohawk Valve, Westran, Burke Stainless Steel Paint and Clow, all previous principals of S-S. In addition, R.S. Valve has continued to service the same wholesalers and distributors previously serviced by S-S. Smith denied that he took any customer lists from S-S, but admitted that he had retained copies of all contracts entered into between S-S and its principals as well as industry catalogs and product comparison charts. At the time he left S-S in April, Smith told Shrader that he wanted the catalogs for his ongoing business in Florida, but did not tell him that he was setting up a competitive business in Illinois. Smith also denied asking Reid to contact Nemanich, Jones and Mutschler on his behalf. However, he did tell Reid how highly he regarded those employees and that his attorney had advised him against contacting any S-S employees personally.

Smith further testified that Conbraco represented 99½% of R.S. Valve's gross commissions during its first six months of operation. For fiscal year 1982, R.S. Valve's gross commissions were approximately $500,000, 90% of 95% of which were attributable to manufacturers previously represented by S-S. In fiscal year 1983, approximately 80% of R.S. Valve's gross commissions were attributed to those same manufacturers.

Shrader testified that in 1980, Conbraco represented 85% of S-S's gross commissions. Conbraco terminated its contract with S-S in May 1981, and Saunders Valve, Mohawk Valve, Westran, Clow and Burke Stainless Steel Paint terminated their association with S-S immediately thereafter. S-S retained three lines it had had prior to Smith's resignation and has acquired some new lines. However, due to the loss of its key accounts, S-S earned gross commissions on only $50,000 for fiscal year 1982 and $25,000 to the date of trial in 1983,

compared to $642,439 and $531,702 for fiscal years 1980 and 1981, respectively. Due to the loss of business income, Shrader had to terminate the employment of Jones and Mutschler.

Defendants first contend that the trial court erroneously concluded that Smith breached his fiduciary duty as officer, director and shareholder to Shrader and S-S. Specifically, defendants argue that the evidence established beyond a doubt that prior to his resignation, Smith acted on behalf of S-S and any overtures to potential customers or employees referred only to a possible future relationship and, thus, were permissible practices. We disagree and find *H. Vincent Allen & Associates, Inc. v. Weis* (1978), 63 Ill. App. 3d 285, 379 N.E.2d 765, dispositive of the issue.

In *H. Vincent Allen*, plaintiff, a commercial art studio, filed suit against Weis, a former salesman and vice president of plaintiff and against the commercial art studio established by Weis immediately after leaving plaintiff's employ, seeking damages for losses incurred by Weis' breach of fiduciary duty in the solicitation of plaintiff's valuable accounts and employees. Weis was involuntarily terminated by plaintiff on May 31, 1968, and subsequently started his own art business which eventually employed 13 former artists of plaintiff and serviced several of plaintiff's former accounts. As a direct result of the loss of specialized personnel and key clients, plaintiff's gross profits dropped from $405,000 to $146,000 between 1969 and 1971. At trial, former associates of plaintiff who were then current employees of Weis testified that they had not been approached by Weis until after they had left plaintiff's employment.

■ In holding that Weis had breached his fiduciary duty, the *H. Vincent Allen* court focused on two well-established legal axioms in the area of corporate law: (1) officers and directors of a corporation cannot actively exploit their positions within the corporation for their own personal benefit; and (2) the activities of officers and directors may not hinder or defeat the ability of the corporation to continue the business for which it was developed. (*H. Vincent Allen & Associates, Inc. v. Weis* (1978), 63 Ill. App. 3d 285, 291.) The *H. Vincent Allen* court found that defendant's violation of both principles of corporate conduct constituted a breach of his fiduciary duty to the corporation.

■ Application of the aforementioned legal principals to the case at bar supports the trial court's finding that Smith breached his fiduciary duty to S-S. The testimony of both Charles Eastman and Carl Mosack indicate Smith's active exploitation of his position with S-S for his own benefit and S-S's economic detriment. Further, as attested to by the drastic drop in gross commissions earned by S-S for

the fiscal year following Smith's resignation and the concomitant departure of key accounts, Smith's exploitation severely hindered S-S's ability to continue the business for which it was developed. Defendants attempt to minimize the instances of solicitation by claiming that Eastman's testimony as to statements made by Casper was hearsay and that Smith's comment to Carl Mosack of Saunders Valve amounted to no more than a routine complaint by Smith about S-S. However, the hearsay objection was not preserved for review (*Vee See Construction Co. v. Luckett* (1981), 102 Ill. App. 3d 444, 430 N.E.2d 91), and we are not persuaded that the comments to Mosack were merely casual, offhand remarks. The importance of the remarks is illustrated by the fact that after an association of nearly 25 years with S-S, Conbraco was considering terminating its contract as early as March 1981, and actually did so within one month of Smith's resignation. Conbraco then entered into a contract with R.S. Valve.

With respect to Smith's solicitation of S-S employees prior to his resignation, Smith contends that not only did he not personally solicit any S-S employees, but that those who were contacted by Reid were not approached until after Smith had resigned. Although Smith may not have made the initial contact with S-S employees, the record indicates that once the employees were contacted by Reid, they were told to discuss the particulars of possible employment, such as salary, with Smith. In our opinion, Reid's position as the initial contact does not act to neutralize Smith's follow-up solicitation. Further, we do not consider the actual date on which S-S employees were contacted to be indicative of Smith's fairness in approaching them. As stated in *H. Vincent Allen & Associates, Inc. v. Weis* (1978), 63 Ill. App. 3d 285, 379 N.E.2d 765:

> "The constructive trust imposed upon officers and directors applies as well to transactions completed after the termination of the party's association with the corporation 'if the transactions began during the existence of the relationship or were founded on information or knowledge acquired during the relationship.' " (63 Ill. App. 3d 285, 292, quoting, in part, *Mile-O-Mo Fishing Club, Inc. v. Noble* (1965), 62 Ill. App. 2d 50, 57, 210 N.E.2d 12.)

Undoubtedly, Smith's acquaintance with and knowledge of the ability and specialized training of Nemanich, Fahlstrom, Jones and Mutschler were acquired as a direct result of his association with S-S. Considering that Jones and Mutschler comprised the entire secretarial staff of S-S and Nemanich and Fahlstrom comprised two-thirds of the nonofficer sales staff, Smith's solicitation of these key personnel was a clear

violation of the constructive trust imposed upon him as former officer and director of S-S.

In addition, we find *Ellis & Marshall Associates, Inc. v. Marshall* (1974), 16 Ill. App. 3d 398, 306 N.E.2d 712, and *Technical Representatives, Inc. v. Richardson-Merrell, Inc.* (1982), 107 Ill. App. 3d 830, 438 N.E.2d 599, relied upon by defendants, factually distinguishable from the case at bar. In *Ellis*, an interlocutory appeal, plaintiff corporation claimed that defendant, a former officer, director and employee of the corporation, breached his fiduciary duty when he solicited certain clients and employees of plaintiff at a trade show while still an officer, director and employee. The trial court held for defendant, and the reviewing court affirmed, stating that the evidence failed to do any more than show that defendant informed certain clients of his intention to leave plaintiff's employ. "The defendant here did not ask the plaintiff's clients to approve his plan or even attempt at that time to persuade them to employ him in his new capacity." (16 Ill. App. 3d 398, 404.) By contrast, in our case, Eastman testified that Smith specifically requested the Saunders Valve line from Loren Casper. Similarly, Mosack stated that Smith had specifically asked for Conbraco's coverage. In our opinion, this degree of solicitation transcends mere commentary on possible future plans. With respect to *Technical Representatives, Inc.*, because the court did not address the fiduciary duty of an officer or director to a corporation, we find it unpersuasive as to defendant's position.

Defendants next contend that the trial court's finding that Smith tortiously interfered with the business relations of S-S was against the manifest weight of the evidence.

The general principle of tortious interference with business relations is set forth in the Restatement of Torts sec. 766 (1939), which provides:

> "[O]ne who, without a privilege to do so, induces or otherwise purposely causes a third person not to
> (a) perform a contract with another, or
> (b) enter into or continue a business relation with another.
> is liable to the other for the harm caused thereby."

Section 768 enumerates the four requirements necessary to establish the aforementioned defense of "privilege": (1) the business relation must concern a matter involved in the competition between the actor and the competitor; (2) the actor must not employ improper means; (3) the actor must not intend to create an illegal restraint of competition; and (4) the actor's purpose must be at least partially to advance his interest in competing with his competitor. (Restatement of Torts

sec. 768 (1939).) Smith claims that because there was no provision in his contract that would prevent him from resigning and forming his own company, he was free to take advantage of his knowledge and experience in the field gained during his association with S-S. We concur with Smith's statement, however, the application of personal knowledge and experience gained while at S-S is not the issue. Rather, the issue is whether Smith employed improper means when he interfered with the business relations established between S-S and its manufacturers and key employees. Our conclusion that Smith breached his fiduciary duty by soliciting key clients and former employees of S-S clearly shows that improper means were used, thus, defeating Smith's claim of "privilege." See *Michigan Avenue National Bank v. State Farm Insurance Cos.* (1980), 83 Ill. App. 3d 507, 514, 404 N.E.2d 426.

■ Defendants next contend that the trial court erroneously determined that Smith acted with malice and, consequently, erred in awarding punitive damages and attorney fees.

It is well established that the term "malice" when used in the context of a cause of action for interference with contractual relations does not require a showing of ill will, hostility or an intent to injure. Rather, plaintiff must show that the defendant acted intentionally and without just cause. (*Getschow v. Commonwealth Edison Co.* (1982), 111 Ill. App. 3d 522, 444 N.E.2d 579.) In this regard, an intentional act is not limited to "unabashed third party conduct which induces one party to outrightly repudiate and breach its contract"; it also encompasses "subtle third party conduct which achieves essentially the same result." *Hannigan v. Sears Roebuck & Co.* (7th Cir. 1969), 410 F.2d 285.

In the case at bar, the evidence supports the trial court's decision that Smith intentionally interfered with S-S's client's and employees without just cause. Smith directly confronted the top management of S-S's two largest principals, told them he was leaving S-S and asked if they would give him their business. Testimony further indicates that on several occasions prior to his resignation, Smith mentioned that at least two of S-S's key employees would be joining his new venture. Thus, his intentions were obvious. Further, the fact that he accomplished his goals through improper means establishes the absence of just cause. Accordingly, we find that the record supports the trial court's finding of malice, which under Illinois law provides sufficient grounds for an award of punitive damages and attorney fees. *Glass v. Burkett* (1978), 64 Ill. App. 3d 676, 381 N.E.2d 821. See *Romanik v. Lurie Home Supply Center, Inc.* (1982), 105 Ill. App. 3d 1118, 435

N.E.2d 712.

■ Defendants next contend that the trial court erroneously ordered a forfeiture of all Smith's compensation paid by S-S since February 1, 1981, the date on which Smith discussed his departure with Carl Mosack at the Conbraco sales meeting. We disagree and find *ABC Trans National Transport, Inc. v. Aeronautics Forwarders, Inc.* (1980), 90 Ill. App. 3d 817, 413 N.E.2d 1299, dispositive of the issue.

In *ABC*, plaintiff sought to enjoin defendants, key employees of plaintiff, from diverting plaintiffs' personnel and customers to a competing firm. The trial court found defendants liable and awarded plaintiff damages for lost profits and one-third of the compensation paid to the individual defendants during their period of wrongful activity. On appeal, the reviewing court modified the salary forfeiture award, holding that plaintiff was entitled to the total compensation it had paid the individual defendants during the period of conspiracy. In reaching this conclusion, the *ABC* court stated:

"[W]ithin the actual period of tortious conduct, salary forfeiture is required because the agent's services are not being 'properly' performed. *** As a matter of public policy ***, one who breaches fiduciary duties has no entitlement to compensation during a wilful or deliberate course of conduct adverse to the principal's interests." *ABC Trans National Transport, Inc. v. Aeronautics Forwarders, Inc.* (1980), 90 Ill. App. 3d 817, 838.

We adopt the rationale of the *ABC* court, and conclude that the evidence in the case at bar supports the trial court's finding that Smith forfeited his right to all compensation paid to him by S-S since February 1, 1981. Further, we find defendants' reliance on *Monotronics Corp. v. Baylor* (1982), 107 Ill. App. 3d 14, 436 N.E.2d 1062, misplaced on the ground that there is insufficient evidence to show that Smith worked diligently on behalf of S-S during his last few months of employment.

■ Finally, defendants contend that the trial court erred in dismissing Smith's counterclaim which sought dissolution of S-S based on shareholder deadlock. Defendants claim that S-S has "self-destructed," and, therefore, the order of dissolution would be a "mere formality."

The facts in our case are substantially similar to those in *Callier v. Callier* (1978), 61 Ill. App. 3d 1011, 378 N.E.2d 405, in which the court addressed the issue of whether there was sufficient proof of either deadlock or irreparable injury within the meaning of the Illinois Business Corporation Act to justify dissolution and liquidation of a

corporation. After careful review of the record, the court concluded that there was insufficient proof to show either deadlock or irreparable injury, stating, "[T]he evidence shows *** two equal shareholders who were unable to get along and unable to reach agreement *** as to the redemption of one's shares by the other or to the terms of voluntary dissolution. This is not equivalent to an inability of the corporation to perform the functions for which it was created." (61 Ill. App. 3d 1011, 1015.) We concur with the *Callier* court's analysis and find it applicable to the facts at bar. As a result, we conclude that defendants' failure to demonstrate legitimate shareholder deadlock coupled with the manifest unfairness of allowing Smith, who breached his fiduciary duty to S-S, to force dissolution of what is remaining of S-S, compels us to affirm the trial court's determination as to dissolution.

For the foregoing reasons, the judgment of the circuit court of Cook County is affirmed.

Affirmed.

BUCKLEY, P.J., and McGLOON, J., concur.