In re Charles Henry HOLLER
and Carlinda Kathleen
Holler, Debtors.

Robert M. McGILL, Trustee
for Bankrupts, Plaintiff,

v.

TROOPER PUBLICATIONS, INC., FCIA Marketing, Inc., Allen F. Bennett, individually and as an Officer and Director of Trooper Publications, Inc. and as a Director of FCIA Marketing, Inc., and Mary Bennett, individually and as an Officer and Director of Trooper Publications, Inc., and of FCIA Marketing, Inc., Defendants.

Bankruptcy No. 90–71203.
Adv. No. 92–7089.

United States Bankruptcy Court,
C.D. Illinois,
Danville Division.

Oct. 4, 1994.

**624**

Verne H. Evans, Springfield, IL, for plaintiff.

Edward F. Flynn, Jeff Justice, Decatur, IL, for defendants.

### OPINION

GERALD D. FINES, Bankruptcy Judge.

This matter is before the Court on a Complaint by the Trustee in Bankruptcy asserting certain causes of action in favor of the Debtors, Charles Henry Holler and Carlinda Kathleen Holler, against the above-captioned Defendants. The causes of action arise from a contractual relationship between Charles Henry Holler and Defendant, Trooper Publications, Inc. (TPI) and the stock ownership interest of Carlinda Kathleen Holler in FCIA Marketing, Inc. (FCIA). Pursuant to 11 U.S.C. § 541(a), the causes of action of the Hollers' against Defendants are property of their bankruptcy estate and, as such, are asserted by the Trustee. *In re Cottrell*, 876 F.2d 540 (6th Cir.1989); and *In re Computer Communications, Inc.*, 824 F.2d 725 (9th Cir. 1987). Pursuant to 11 U.S.C. § 542, the Trustee brought this adversary to recover property of the Debtors' bankruptcy estate for the benefit of creditors. A five day trial was held in this matter on August 8–12, 1994, and the parties were allowed time to file written closing arguments. The Court has now had the opportunity to consider all of the evidence adduced at trial and the closing arguments of the parties in making its findings of fact and conclusions of law pursuant to Rule 7052 of the Federal Rules of Bankruptcy Procedure.

### I. Findings of Fact

#### A. Background

A complete understanding of the Plaintiff's causes of action requires a chronology of events dating back to 1984 when Defendant, TPI, was formed by Allen Bennett and Mary Bennett to conduct fund raising activities for State Troopers Lodge # 41. Both TPI and FCIA are corporations which engage in professional fund raising for various organizations (clients), including Lodge # 41, the Illinois Retired Teachers' Association, Federal Criminal Investigation Association, and the Policemen's Benevolent and Protective Association. The fund raising activities of both TPI and FCIA are conducted primarily through telemarketing, commonly referred to as "phone solicitation." Both TPI and FCIA Marketing, Inc. received the lion's share of the funds which they solicited on behalf of their clients.

In 1983 and 1984, State Troopers Lodge # 41 [1] was experiencing difficulties surrounding its fund raising activities. The present President of Lodge # 41, Larry Simms, testified that, in 1984, the Lodge utilized an outfit named OSC Corporation, out of Boston, Massachusetts, to conduct fund raising for the Lodge. OSC's work for Lodge # 41 was headed by Paul Gobin. Under his management of telemarketing for the Lodge there were numerous complaints made to ranking State Police officials and to the Office of the Attorney General for the State of Illinois. These complaints generally concerned telemarketers who had allegedly represented

---

1. State Troopers Lodge # 41 is a fraternal organization having as its members both active and retired Illinois State Troopers. Since 1984, Lodge # 41 has also been the collective bargaining agent for the Illinois State Troopers in dealing with the State on contract negotiations.

themselves as State Police officers directly or had, by their presentation techniques, led solicited individuals to believe they were police officers.[2] The complaints caused high ranking State Police officials to pressure Lodge # 41 to revise its fund raising activities. The complaints also brought threats to abolish Lodge # 41 because officials felt the problems surrounding the Lodge's fund raising activities served to tarnish not only the image of the Lodge, but also the image of the Illinois State Police. Lodge # 41 could ill-afford the problems with OSC Corporation given its attempt to become the collective bargaining agent for the Illinois State Troopers starting in 1984. Allen Bennett testified that both the Governor's Office and the Office of Director of the State Police opposed Lodge # 41's attempt to become the collective bargaining agent, and it was felt that there was a need to rectify the problems with the Lodge's fund raising activities. In an attempt to rid itself of the complaints about its fund raising program, the Lodge terminated its relationship with OSC and sought another professional fund raiser to take its place. The number one goal of Lodge # 41 at this point was to get rid of the complaints, and to this end the Lodge contracted with an old friend, Allen Bennett, to continue raising funds for the Lodge.

Allen Bennett is an attorney who began his career in law in Sullivan, Illinois, as a private practitioner in 1968. Allen Bennett served in the public sector for 4 years as Moultrie County State's Attorney; for a time as an Assistant Attorney General; and as a State Representative in the General Assembly from 1977 to 1979. In 1979, Mr. Bennett became legal counsel to Lodge # 41, and, using the knowledge gained in the General Assembly, acted also as a lobbyist for the Lodge. In 1984 in their search for a replacement for Paul Gobin and OSC Corporation, the Lodge hierarchy approached Bennett

about the possibility of taking on the job of fund raising for the Lodge and publishing the Lodge's magazine, the *State Trooper.* After several discussions with Lodge officials and some inquiries about the professional fund raising business, Bennett decided to accept the task. To this end, Bennett formed a corporation, on February 22, 1984, known as Trooper Publications, Inc., a corporation wholly owned by Bennett and his wife, Mary K. (Tina) Bennett. The corporation was formed to perform both the fund raising activity of Lodge # 41 and to publish its magazine. TPI and Lodge # 41 thereafter entered an agreement under which TPI solicited funds for the Lodge with 20% of the funds going to the Lodge and 80% to TPI.

During its first year of business, TPI had limited success. Allen Bennett testified that he had little knowledge about telemarketing and professional fund raising and, in the early going, sought experienced people to run the telemarketing end of the business for him. From February 1984 to May 1985, Bennett went through several telemarketing managers in an effort to get things up and running. In May 1985, Bennett once again found himself in need of someone experienced to run TPI's telemarketing program. He found Charles Henry Holler.

In 1976, at the age of 16, Charles Holler (Holler) dropped out of high school after his sophomore year in Springfield and worked in restaurants until he turned 18. In April 1979, Holler went to work for Paul Gobin, of OSC Corporation, as a telephone solicitor soliciting funds for Troopers Lodge # 41. Holler moved up the ladder with OSC quickly and, by mid–1982, was second in command to Paul Gobin.[3] In 1982, Holler left OSC and went to work for Callan Publishing in Kentucky as state manager for telemarketing on behalf of the Kentucky Fraternal Order of

**2.** Testimony at trial from seasoned telemarketers indicated that misrepresenting oneself as a State Trooper directly or indirectly generally caused solicited individuals to give a greater contribution. The solicited individuals gave more either thinking they were dealing directly with a police officer who benefitted from the fund raising or thinking that giving more would enhance their relationship with the State Police.

**3.** Holler testified that Gobin was his mentor and his idol. Holler learned much from Gobin about telemarketing and, in particular, he learned solicitation techniques aimed at making solicited individuals believe the solicitor or telemarketer was a police officer, a factor which it seems generally increased the level of funds pledged by those solicited.

Police. In April or May 1985, Callan lost its contract with the Kentucky Fraternal Order of Police and sought to transfer Holler to Florida. Holler was not interested in moving his family to Florida, so he began seeking employment back in Illinois. At the suggestion of his wife, Carlinda, Holler contacted some people at Lodge # 41 about a possible telemarketing position with its fund raiser. Holler was referred to Allen Bennett, and the two met, resulting in Bennett hiring Holler to manage the telemarketing side of TPI's business. Within 2 weeks of their first meeting, Holler moved back to Springfield and brought a crew of experienced telemarketers with him from Kentucky.

Initially, Holler entered into a "handshake deal" with TPI under which he agreed to take total responsibility for TPI's telemarketing activity in exchange for a payment of 38% of gross revenue generated by the telemarketers. Out of this 38%, Holler paid the telemarketers' commissions, the drivers or couriers who picked up funds pledged by solicited individuals, people to sort lead cards, and clerical help. Funds remaining after these people were paid were Holler's profit. Holler's telemarketing success at first wasn't nearly as good as he had expected, starting off with only about $1,000 gross revenue in the first week and climbing to $15,000 by the 12th or 13th week with TPI. In light of the slow but steady progress Holler was making in increasing TPI's gross revenues, Bennett approached Holler, in September 1985, with a proposal to enter into a written contract between Holler and TPI to solidify their relationship.

On September 7, 1985, Holler, doing business as Triple–C Advertising, entered into a written Service Agreement (Plaintiff's Exhibit No. 3) with TPI wherein Holler was given complete authority as an independent contractor to manage and develop the telemarketing side of TPI's business. The Agreement

between the parties was initially drafted by Allen Bennett with Holler negotiating a couple of clauses which were inserted in the final draft signed by the parties. Holler was to have the authority to make all decisions concerning the telemarketing operation under the Agreement, however, it soon became apparent that that authority was tempered by Allen Bennett's hand in deciding certain aspects of the business, including hiring and firing of telemarketers and supervisors and the mode of operation. The Agreement between Holler and TPI bound Holler to work exclusively for TPI, but gave Holler room to exercise some initiative in raising revenue and bringing in new clients.

In exercising his initiative, Holler took his promise to make Bennett a million dollars seriously.[4] The first initiative Holler introduced was to change the collection of solicited funds from a "mail system" where invoices were sent to solicited individuals for payment to a "collector system" where couriers or drivers physically went to pick up the funds after they were solicited. This new system cut down on what Holler referred to as "buyer remorse" and increased actual funds collected from 50–60% of those pledged under the "mail system" to approximately 97% under the "collector system."[5] Holler also reworked TPI's telephone system and began the use of road crews that moved into specific geographic areas to concentrate solicitation efforts, a mode of operation which Holler considered highly effective in increasing gross revenues. Of Holler's initiatives, the most interesting was his development of an 800 number phone system that directed complaints about the telemarketers (heat calls) away from the clients (Lodge # 41, etc.) and law enforcement officials. Instead of calling the client or law enforcement officials, solicited individuals and businesses were directed to call an 800 number which

**4.** Holler testified that in his first meeting with Allen Bennett he was very optimistic about what he could do for TPI and that he told Bennett, "I'll make you a million dollars."

**5.** In the case of Lodge # 41, the telemarketers would contact prospective individuals or businesses by telephone to solicit funds for the Lodge in return for which those solicited received ad-

vertising space in *State Trooper* magazine. Once funds were pledged, a courier or driver would go directly to the location of the individual or business and pick up the funds, usually within the same day. This system narrowed the instance of changes of heart by a contributor in the time between the pledge and actual payment of the pledge.

was provided to them on every invoice sent out by TPI. The 800 number rang in the telemarketing office of TPI and the so-called heat calls were often handled by the very telemarketers that were the subject of the complaint, under fictitious names. This new system of handling complaints was very successful in keeping the complaints from going to the clients or law enforcement officials as evidenced by the testimony of both Larry Simms, President of Lodge # 41, and former State Police Superintendent, Laimutis Nargelenas. Their testimony indicated that complaints about telemarketing to their offices dropped dramatically in the period after 1984. Holler introduced some other initiatives during his tenure with TPI which, together with those mentioned above, helped to increase the gross revenues of TPI to in excess of $50,000 per week by 1988.

While Holler was overseeing the telemarketing end of TPI, Tina Bennett was handling the publishing of the *State Trooper* magazine and the administrative side of the business. Tina Bennett also handled bookkeeping for TPI together with her mother and by herself after her mother's death. Allen Bennett oversaw all aspects of the business and took an active role in obtaining new clients. In particular, it is apparent that, although Holler was given wide latitude as an independent contractor to handle TPI's telemarketing activities, Allen Bennett was the boss and made some decisions which, under the agreement between TPI and Holler, appeared to be within Holler's providence. Allen Bennett personally fired at least one key telemarketing supervisor against Holler's wishes and ended the use of road crews, which Holler felt were effective in increasing gross revenues.

In furtherance of his contractual authority to develop new business for TPI, Holler succeeded in obtaining a contract with the Dale Corporation [6] to act as professional fund rais-

er for Dale's client Federal Criminal Investigators Association (FCIA). In response to this new client, Allen Bennett decided that a new corporation should be formed to exclusively handle fund raising for FCIA. Bennett testified that both he and Holler had young wives and that they wanted to get the wives more involved in the business. To this end, a corporation known as FCIA Marketing, Inc. was formed, on April 17, 1986, with Tina Bennett holding a 55% ownership interest and Carlinda Holler holding the remaining 45% ownership interest. Tina Bennett was elected as a Director of FCIA Marking, Inc. and also as President and Treasurer of the corporation, on April 20, 1986. Carlinda Holler was elected as a Director and as Secretary of the corporation, positions which Mrs. Holler says she was basically unaware of until the initiation of this lawsuit.[7] The evidence indicates that Tina Bennett was largely responsible for carrying on the administrative affairs of FCIA Marketing, Inc., with the telemarketing affairs being conducted by Chuck Holler.

In order to fulfill its contract with Dale Corporation, FCIA Marketing, Inc. needed a staff of telemarketers, which TPI already had. As such, an agreement was entered between TPI & FCIA Marketing, Inc. (Plaintiff's Exhibit No. 14) which provided, in pertinent part, as follows:

> Whereas, TPI already has assets and personnel needed to facilitate the performance and completion of a telemarketing contract FCIA enjoys with The Dale Corporation; and

> Whereas, it is in the best interests of FCIA and TPI to utilize said TPI's assets and personnel;

> Now, therefore, in consideration of the foregoing and in consideration of the mutual undertakings herein, IT IS AGREED AS FOLLOWS:

---

**6.** The Dale Corporation was a company very similar to TPI in that Dale raised funds on a national level for various clients and, in the case of the Federal Criminal Investigators Association, published a magazine in which ads sold through telemarketing efforts were placed.

**7.** Carlinda Holler testified that she never actually did any work for FCIA Marketing, Inc. and was only in the office on rare occasions; however, she received a substantial salary from the corporation up to September 1988. Mrs. Holler received no more money in salary or otherwise following her husband's departure from TPI in early September 1988.

1. TPI shall provide FCIA the unlimited use of corporate management personnel and employees, corporate assets and equipment, past and current customer sales leads generated by TPI corporate employees and independent contractors, office supplies, and furnishings, leasespace, support, and other reasonable and necessary service and/or corporate property in order to perform to completion FCIA's April 21, 1986, contract with The Dale Corporation.

2. FCIA shall pay TPI for its reasonable corporate expenses, including but not limited to personnel, use of equipment, sales leads, office supplies, office furnishings, lease space, support and other services, a reasonable profit, and for any other expense its officers deem appropriate in the furtherhance (sic) of this agreement.

This agreement was executed by Allen Bennett as President of TPI and Tina Bennett as President of FCIA Marketing, Inc. In addition to its activities through the offices of TPI in Springfield, FCIA Marketing, Inc. quickly expanded to have telemarketing offices in Chicago, Illinois, and in the States of Missouri and New York. The Dale Corporation contract proved to be fairly lucrative for FCIA Marketing, Inc. with reports (Plaintiff's Exhibit No. 29) showing in excess of $1,300,000 of gross revenues for fiscal years 1986–1988 [8] and in excess of $930,000 in commissions [9] to FCIA Marketing, Inc. for those same fiscal years. The relationship between FCIA Marketing, Inc. and Dale Corporation continued until approximately May 1992 when, for some unknown reason, the contract between Dale and FCIA Marketing, Inc. was terminated and a new contract was entered into on substantially similar terms only with TPI performing the services previously performed by FCIA Marketing, Inc.

---

8. FCIA Marketing, Inc. adopted a fiscal year running from April 30 to April 30 of each year.

9. FCIA Marketing, Inc. received a 70% commission on all gross revenues solicited on behalf of Dale Corporation. Dale was the only client that FCIA Marketing, Inc. ever had.

10. The telemarketers were considered to be independent contractors of TPI by Allen Bennett.

Between the years 1985 and 1988, the relationship between the parties to this action flourished as did the business of both TPI and FCIA Marketing, Inc. The gross revenues of TPI (according to Federal Income Tax returns, Plaintiff's Exhibit No. 15) increased from $873,476 in 1985 to nearly $2,000,000 annually in 1987 and 1988. The gross revenue of FCIA Marketing, Inc. remained fairly constant with a high of $497,-595.50 in fiscal year 1986 ending on April 30, 1987. (Plaintiff's Exhibit No. 29). The compensation paid to Holler, his wife Carlinda, and the Bennetts also increased dramatically between 1985 and 1988, but this rosy picture had a dark side which played an important role in the relationship of the parties and in giving rise to the causes of action presently before this Court.

## B. Drug and Alcohol Abuse

From the inception of Holler's tenure with TPI, there were numerous difficulties with the telemarketing personnel.[10] At the very least, it can be said that many of the telemarketers working with TPI were unreliable. They often failed to appear for work and occasionally some would arrive at work drunk or high on drugs. It was not unusual for the telemarketers to become intoxicated during breaks and at lunch. There was a significant amount of testimony indicating that alcohol was consumed on and about the premises of TPI during working hours and that marijuana was frequently smoked in the parking lot. The evidence indicated that many of the telemarketers would disguise beer and hard liquor by putting it in "Hardee's" cups and drink it while actually at their work stations. One former telemarketer of TPI, Buck Goodman, testified that some of the telemarketers drank alcohol and/or smoked marijuana to get up the courage to employ solicitation techniques designed to

---

The telemarketers entered into contracts directly with TPI after September 7, 1985. It is apparent that the main purpose of this arrangement was to relieve TPI of the obligation to pay withholding taxes and unemployment insurance in that the actual, practical relationship between TPI and the telemarketers more resembled that of employer-employee rather than independent contractor. This distinction in itself plays an important role in this proceeding.

mislead contacts into believing the solicitors were either State Troopers or direct representatives of the Illinois State Police. Goodman testified that the telemarketers were more relaxed when under the influence of alcohol and/or marijuana and that it was easier to come up with solicitation lines aimed at getting a contribution even if those lines were misleading. Ironically, the telemarketers used illegal drugs and alcohol to allow them the courage to stress the need for law and order in their solicitation pitch aimed at increasing contributions. Goodman specifically testified that the telemarketers used language designed to show strong support for law and order as a means of getting potential contributors' support. Apparently, the telemarketers occasionally became too relaxed and would spend their time just talking to each other on the phones rather than calling prospective leads. This testimony was confirmed by Holler and other telemarketing witnesses, including Dave Jordan, TPI's present telemarketing head. Dave Jordan admitted to having once been sent home by Holler for drug abuse at work. Jordan further testified that he still smokes marijuana on occasion and that many of the problems with drug and alcohol abuse still exist among the telemarketers at TPI. In addition to the abuse of alcohol and/or marijuana, several of Plaintiff's witnesses testified that some of the telemarketers used cocaine, and Buck Goodman testified that he used LSD and was sent home from work at one point in time when caught with LSD. Holler considered the cocaine use and the use of LSD to be particularly counterproductive and exercised his authority to prohibit the use of these drugs as best he could. There is also significant evidence indicating that, not only were illegal drugs used by the telemarketers on and off of the premises of TPI, but that there were drugs being bought and sold amongst the telemarketers on the premises of TPI.

It is apparent that Holler attempted to deal with drug and alcohol abuse among the telemarketers, even in light of his own admitted use of alcohol and marijuana. Holler testified that he smoked marijuana occasionally while with TPI and he drank alcohol; however, he didn't condone those activities in the work place because he saw them as counterproductive in raising revenues. A cat and mouse relationship existed between Holler and the telemarketers with Holler knowing that alcohol and drugs were being used, but playing along so long as the abuses didn't interfere with the gross telemarketing revenues. When some abuse affected revenues, Holler would generally give the offending party a few days of unpaid vacation and some were even convinced to attend rehabilitation programs. Holler testified that the work suspensions weren't very effective, and, if a really good telemarketer (referred to by the witnesses as a pro) was gone for a few days, it would seriously affect the gross revenues. Usually suspended telemarketers were brought back to work early to help keep the gross revenues on the rise.[11]

In addressing the issue of drug and alcohol abuse by the telemarketers, the Defendants have taken an inconsistent approach. On the one hand, the Defendants assert that the illicit behavior testified to by Holler and other Plaintiff's witnesses did not occur. Allen Bennett testified that there were no drug and alcohol problems that he was aware of, and Defendants' State Police witnesses testified that they never saw any abuse of alcohol or drugs on or about the premises of TPI's telemarketing office.[12] There is no question that State Police Officers were frequently in and around the TPI offices, but they weren't there constantly and they didn't have much incentive to investigate TPI's telemarketers, while the telemarketers had a great deal of

---

11. Allen Bennett was very determined to ever increase the gross revenues raised by the telemarketers. This determination is reflected in the letters introduced into evidence as Plaintiff's Exhibit Nos. 7, 8, 9, 10, and 11.

12. TPI's telemarketing office was initially located within the building occupied by Lodge # 41 and remained there for a short period after Holler began at TPI. Subsequently, TPI moved to a location apart from Lodge # 41. Most of the testimony about drug and alcohol abuse on the TPI premises concerned TPI's offices after the move from Lodge # 41.

incentive to keep any drug or alcohol use hidden from them. The Defendants' fallback position to a total denial of drug and alcohol abuse by the telemarketers is to say that, if such abuse was occurring, they were totally unaware of it. This position is belied by the fact that Holler credibly testified that, on several occasions, he had spoken to Bennett about drug and alcohol problems and his efforts to curb the abuses. There was further credible testimony from Plaintiff's witnesses that Allen Bennett well knew about alcohol use and abuse by the telemarketers, and, at Christmas 1988, he had an office party at which alcohol was served. He passed out bottles of liquor to various individuals including individuals under the age of 21.[13] Gerri Samson testified that Bennett gave liquor to her son, Terry, at the Christmas party. Terry was a minor at the time. He became intoxicated resulting in his arrest and criminal charges. The day following Terry's arrest, Allen Bennett gave Gerri Samson a car, apparently as consolation for Allen's responsibility for Terry's actions. The Defendants' position as to the drug and alcohol abuse is further inconsistent in that Defendants sought to attack the credibility of Plaintiff's witnesses on the abuse issue by labeling them as drug addicts and alcoholics. These inconsistencies lend more credibility to Plaintiff's witnesses rather than less. On the issue of drug and alcohol abuse, the Court found Plaintiff's witnesses to be credible in that they had no pecuniary incentive to testify as they did, and their personal admissions of past and present drug use in open Court against their interest supported the validity of their testimony. There was a definite problem with drug and alcohol abuse among TPI's telemarketers in the years 1985 to 1988. The credible evidence shows that the Defendants were aware of the problem and,

in fact, contributed in part by supplying alcohol at at least one party.[14]

### C. Solicitation Complaints

In 1984, one of the main reasons Lodge #41 terminated its relationship with OSC Corporation and invited Allen Bennett to take on its fund raising activities was due to numerous complaints about OSC's use of improper and/or illegal solicitation techniques aimed at inducing increased giving by solicited individuals. That these complaints were a severe problem was evidenced by Holler's immediate implementation of an 800 phone number to direct complaints back to TPI rather than to State Police Officials or the Illinois Attorney General's Office. It is clear from the evidence adduced at trial that, while the number of complaints about improper solicitation to authorities decreased after TPI took over in 1984, the problems did not disappear.

One of the main business goals of the Defendants was to ever increase the gross revenues on all projects of both TPI and FCIA Marketing, Inc. See: Footnote No. 11. To this end, Holler and his telemarketing staff employed various solicitation techniques aimed at leading solicitation contacts into believing that the telemarketers were directly affiliated with the organization for which funds were being solicited.[15] The sole limitation on solicitation technique was to avoid actually saying one was a police officer. This was illegal and was forbidden by Holler at all times. The evidence also indicated that using misleading statements to lead someone into believing a telemarketer was a police officer or directly affiliated with whatever client funds were being solicited for was also a criminal act in many states other than Illinois. While such actions weren't *per se* illegal under Illinois law, they certainly would have been considered fraudulent mis-

---

**13.** Approximately one third or more of the telemarketers were minors.

**14.** The testimony indicates that there may have been other office parties at which Allen Bennett supplied alcohol; however, the only party specifically mentioned was Christmas of 1988.

**15.** Plaintiff's testimony indicated that Holler, the supervisors (room managers), and professional

telemarketers used questionable and often fraudulent solicitation techniques and that they taught these techniques to new telemarketers as they became more proficient at solicitation. Initially, new telemarketers were given a script to follow in making calls; however, use of these scripts wasn't enforced and apparently not encouraged once a telemarketer was fully oriented to the position.

representations under Illinois Civil Law.[16]

As with the issue of drug and alcohol abuse, the Defendants take an inconsistent position with the issue of misleading and improper solicitation techniques. Here again, the Defendants assert that no misleading or improper solicitation techniques were being used, but, if the Court finds to the contrary, then Defendants, at the very least, were not aware of any such use. The Defendants uniformly testified that no "illegal or improper" solicitation techniques were used and, at the very least, not to their knowledge. The Court has no difficulty in finding that misleading and improper solicitation techniques were used frequently and there is ample evidence to suggest that occasionally the telemarketers would even ignore the rules and directly state that they were police officers in order to obtain a contribution. The Court further finds that both Allen and Tina Bennett were aware of the types of solicitation techniques being employed by the telemarketers.

Even before TPI was formed, Allen Bennett was aware of the problems surrounding the use of misleading and improper phone solicitation techniques. Bennett was aware of the complaints against TPI's predecessor and he took part in policies aimed at covering up any such complaints about TPI.[17] Holler testified that he had described some of the techniques used that would be considered improper, or at the least misleading, to Bennett and that Bennett took no action to change the *status quo*. In fact, it is apparent that Allen Bennett wanted to know how the telemarketers went about the business of acting like police officers without saying so. When told about the various types of techniques, Bennett laughed and joked about them. The use of misleading and/or improper solicitation techniques directly benefitted Allen and Tina Bennett through increased gross revenues and the credible evidence shows that they not only were aware of the techniques being employed by TPI's telemarketers, but that they acquiesced in the conduct for their own benefit. A significant indication of Allen Bennett's knowledge about the conduct of TPI's telemarketers is revealed by an unusual agreement between the Illinois State Police and TPI which was testified to by former Superintendent, Laimutis Nargelenas. This agreement arose as a result of Allen Bennett's letter of June 1, 1987, to Nargelenas concerning news releases issued by Nargelenas' office in areas where TPI was conducting solicitation activities.[18] Bennett was obviously angered about the news releases as is indicated by the fact that he sent a copy of his letter to Nargelenas to the President of Lodge # 41, Phillip Rock, the President of the Illinois Senate at the time, and Mike Madigan, the Speaker of the Illinois House of Representatives. Bennett clearly felt that the news releases would hurt his business, and he put all the pressure he could muster on Nargelenas. That pressure resulted in an agreement to consult Bennett in the future before issuing any such releases. This agreement is a clear indication that, not only was Allen Bennett aware of the lengths to which telemarketers for TPI would go to sell ad space, he also intended to allow them to continue. He himself would go to any length to avoid interference with the process. Finally, on the issue of the Bennetts' knowledge of misleading and/or improper solicitation techniques, the Court

---

**16.** In the interests of brevity, the Court will not set out the specific types of misleading statements and/or misrepresentations used by the telemarketers, but it should be noted that several of Plaintiff's telemarketing witnesses testified to the use of specific words, phrases, inflections, and innuendos used to induce solicited parties into believing that the telemarketers were police officers.

**17.** The 800 number system set up by Holler was approved by Bennett. The clear purpose of this system was to keep "heat calls" away from clients of TPI and the authorities. The system was not designed to actually reduce the number of complaints. It was designed to reduce the number of complaints made directly to clients or the authorities.

**18.** Plaintiff's Group Exhibit No. 12 contains two news releases issued by Nargelenas' office which warned consumers that TPI wasn't a representative of the State Police and to be on the lookout for use of "improper methods to sell advertisements." The news releases also directed concerned citizens to direct complaints to the office of the Illinois Attorney General or to their nearest Illinois Department of State Police Headquarters.

notes that the Defendants have always flatly denied any knowledge of or participation in such activities. This position was firmly taken in Defendants' closing to the extent that Defendants accused Plaintiff of falsely alleging a recent investigation of TPI by the Office of the Secretary of State. The evidence clearly shows that such an investigation did take place and Defendants were mistaken in their argument accentuating the fallacy of Defendants' assertions.[19]

### D. Skimming from Clients

One of the major problems at TPI during Holler's tenure came as a result of a claim one of TPI's couriers made against TPI before the Illinois Department of Employment Security.[20] Holler testified that Bennett sought to have legislation passed in Illinois to once and for all have telemarketing personnel deemed independent contractors. To this end, Bennett arranged to hire the law firm of Phillip Rock, President of the Illinois Senate at that time, to handle the *Buckshot* claim. He arranged to pay $50,000 to get legislation passed to have the independent contractor issue settled as a part of the fee arrangement with Rock's firm. To raise the $50,000, Bennett indicated to Holler that he (Bennett) would skim 2% off the grosses due to clients without telling the clients. Holler objected to this procedure of raising the $50,000 from the beginning; however, Bennett felt that such an action was merely "the push of a button on a computer" and that the clients hadn't really done anything for TPI other than lend their names as a conduit for the solicitation process. The arrangement between TPI and Rock's law firm is memorialized in a letter written to Rock's partner, Dan Fusco, by Allen Bennett, on September 7, 1988. (Plaintiff's Exhibit No. 13).

The Defendants' position as to the arrangement to pay for legislation with clients' money is again inconsistent. The testimony of Allen Bennett reveals a flat denial of any such arrangement to buy legislation with anyone's money. Yet, when cross-examined about the letter of September 7, 1988, (Plaintiff's Exhibit No. 13) Bennett was unable to explain any other valid reason for TPI to pay Rock's law firm a contingency-type fee of $50,000 for legal work that Bennett himself testified was not normally done on a contingency basis. The evidence also indicated that the legal work in question had an actual value of less than $10,000. The inconsistency in Bennett's response is further exemplified in Defendants' closing argument which basically argues that no legislation was actually ever purchased and that the very most Allen Bennett is guilty of is "entertaining an illegal thought." This argument appears to confirm the conversations between Holler and Bennett while at the same time it argues that the Court should ignore the evidence because nothing ever actually happened. The Court, however, cannot ignore the evidence in that at least $15,000 of the $25,000 requested retainer was paid for legal work worth much less than that and there is no evidence indicating where that money came from. Thus, Bennett's position is inconsistent in light of facts which clearly show the plan to buy legislation with clients' money went well past the mere entertainment of an illegal thought. The plan was put into action and the fact that it may have never fully come to fruition is of no real significance.

### E. Holler's Departure

Although they were present on an ongoing basis, the problems at TPI did not cause much difficulty for anyone until early September 1988. While on a trip to Chicago to install a new "room manager" in the Chicago offices of TPI, Holler experienced a religious conversion and became "born again."[21]

---

**19.** The testimony of Defendants' witness, Jack Weatherford, a former employee of the Illinois Attorney General's Office, confirmed that there had been a recent investigation of TPI by the Office of the Secretary of State.

**20.** Midge Buckshot, a TPI courier, filed a claim for unemployment benefits from TPI alleging an employer-employee relationship. TPI contested this claim vigorously and asserted that both the couriers and the telemarketers were independent contractors so as to avoid the tax and withholding requirements had these people been found to be employees.

**21.** The evidence shows that Holler was raised in a Christian family, his father being a minister, and that Holler had strayed from his upbringing. While reading a pamphlet concerning the second coming of Christ and the Bible, Holler realized

Upon his return to Springfield, Holler told his wife about his experience, and she too became "born again." Holler apologized to Gerri Samson, at TPI offices in Springfield, for the things that he had gotten her and her two sons into, and he informed Samson that several things had to be changed at TPI, including the abuse of drugs and alcohol and the use of misleading and/or improper solicitation techniques. Holler also felt it was imperative to convince Allen Bennett to abandon his effort to buy legislation concerning the independent contractor issue with clients' money. To this end, Holler contacted Allen Bennett by phone and set up a meeting in Bennett's Decatur office for the following Monday.[22]

On Monday, September 12, 1988, Holler went to Allen Bennett's office in Decatur together with his wife and several telemarketers. At the meeting, the parties discussed the nature of Holler's "born again" experience and how that affected his need to deal with the drug and alcohol abuse of the telemarketers and the solicitation techniques which were, at the least, immoral and unethical. Holler expressed the need to remedy these situations immediately. Bennett told Holler to think about things and they would decide what to do in time. Bennett initially gave Holler thirty days to think about what changes needed to be made. The issue of buying legislation with clients' money was not discussed at the September 12 meeting, but Holler did discuss this further with Bennett privately, to no avail. On Wednesday or Thursday of the same week, Bennett contacted Holler and pressed him for a decision about his plans. Bennett informed Holler that he had one week to make a decision in that they were involved in a very fast-paced business and Bennett could not wait thirty days for a decision. Holler indicated to Bennett that he would continue under his contract with TPI if he could take serious measures to once and for all end the drug and alcohol abuse of the telemarketers and cease the use of any questionable solicitation techniques. Holler also indicated to Bennett that he could not be a part of Bennett's plan to buy legislation using clients' money. Bennett responded to Holler that any measures could be taken as long as they did not decrease the gross revenues of the telemarketers. Holler indicated that the necessary measures would most certainly decrease the gross revenues initially, but they would eventually rebound, although they might never reach the same level as they were at in September 1988.[23] It is clear that Bennett would not accept any decrease in the revenues nor did he agree to abandon his plans with regard to the independent contractor legislation. In light of Bennett's position on these matters, Holler determined that he could not and would not continue in his position at TPI under the conditions imposed by Bennett. As such, Holler cleaned out his desk and left TPI on approximately September 15, 1988.

After his departure from TPI, Holler's fortunes were not favorable, and, in 1990, Holler and his wife filed for relief under Chapter 7 of the Bankruptcy Code. The instant adversary proceeding was filed by the Trustee, in 1992, upon his determination that the Hollers had viable causes of action against the Defendants.

## II. Credibility of Witnesses

One of the crucial matters considered in ruling on Plaintiff's Complaint was the credibility of the witnesses. As stated above, the

---

that his life had to change. There is no dispute as to Holler's "born again" experience. In fact, the evidence shows that Allen Bennett accepted Holler's conversion and understood it in that his ex-wife and some of his children had been "born again."

**22.** At first, Holler didn't tell Bennett about being "born again," but, after Bennett recalled Holler to question the purpose of the meeting, Holler indicated that he had been "born again" and he wanted to discuss what this meant in relation to his contract with TPI. To this, Bennett respond-

ed that he understood what Holler had experienced and that he would be glad to talk.

**23.** Holler testified that it would be necessary to terminate some telemarketers to remedy both the drug and alcohol abuse problems and the use of questionable solicitation techniques, and that some of these people had been very good producers. Holler also testified that merely ending all use of questionable solicitation techniques would reduce TPI's gross revenues regardless of whether any telemarketers were terminated.

Court found the Plaintiff's witnesses to be credible. In making this determination, the Court observed the demeanor of the witnesses, what they said, how they said it, and how what they said related to the documentary evidence and testimony of the other witnesses. The Plaintiff's witnesses had little to gain from testifying as they did and, in the case of Dave Jordan, had something to lose.[24] The testimony of several of Plaintiff's witnesses about their own illegal drug use, both past and present, was not in their own interest and, as such, lent further credibility to their testimony. The Defendants make much of the fact that some of the Plaintiff's witnesses were from Charles Holler's "family tree," but the Court noted no indication that familial relationships played any role in forming the testimony of those witnesses related to Holler.

In considering the credibility of Defendants' witnesses, the Court finds that neither Allen Bennett nor Tina Bennett were credible witnesses. The positions taken by the Bennetts as to the three major problem areas raised by Holler were inconsistent as pointed out above. Allen Bennett's testimony about his lack of knowledge about drug and alcohol abuse and questionable solicitation techniques of the telemarketers was shown to be false by his own actions. Additionally, Allen Bennett's version of his hiring of Rock's law firm defied the logic of the circumstances and his attempts to explain away the evidence (Plaintiff's Exhibit No. 13) not only destroyed his credibility on that issue, but also cast serious doubt on all of his testimony.

In examining the testimony of Tina Bennett, the Court notes that, on direct examination, Mrs. Bennett portrayed herself as an experienced business woman with considerable knowledge in the field of corporate record keeping. However, on cross-examination, it was quickly shown that Mrs. Bennett utilized a flexible system of record keeping for both TPI and FCIA that did not adhere to any known, accepted accounting principles. Mrs. Bennett's actual business practices clearly did not support her assertions of her expertise. The most telling example of Mrs. Bennett's lack of credibility came in her testimony concerning a meeting of directors of FCIA Marketing, Inc. wherein Mrs. Bennett was issued an additional 4,000 shares in FCIA Marketing, Inc., thus raising her ownership interest from 55% to 91%. According to Mrs. Bennett's testimony, she prepared a notice of this meeting on September 20, 1988, and said notice was mailed to Charles and Carlinda Holler on that same date at 1516 South Fifth Street, Springfield, Illinois. (Plaintiff's Group Exhibit No. 2). The Hollers testified that they never received any such notice. On cross-examination of Mrs. Bennett, it was revealed that the Hollers did not live at the address noted on the notice of 1516 South Fifth Street, Springfield, Illinois, until some five months after the date which the notice was supposedly sent to Mrs. Holler. The attempts to rehabilitate Mrs. Bennett's testimony as to the sending of this notice were ineffective and the evidence clearly indicates that the notice upon which Mrs. Bennett was relying could not have been sent on September 20, 1988. Not only did the Hollers not live at that address at that time, they did not even know that they would be living at that address until nearly five months after the notice in question was supposedly sent. From this, the Court concludes that the notice in question was prepared sometime subsequent to the meeting of October 3, 1988, and that no such notice was ever sent to the Hollers prior to the time of the meeting. Not only did Mrs. Bennett's testimony as to the preparation and sending of the notice of September 20, 1988, prove to lack credibility, it proved to be completely false. As such, it detracts from Mrs. Bennett's credibility on the whole. All in all, the Court found that the Defendants' version of the happenings between 1985 and 1988 were not believable. As such, the Court's findings

---

**24.** Dave Jordan is presently working with TPI performing the duties previously performed by Charles Holler. Jordan's testimony wholly supported Plaintiff's assertions about drug and alcohol abuse and also about the use of misleading and/or improper solicitation techniques by the TPI telemarketers; in fact, Jordan testified that there were still drug and alcohol problems at TPI. Jordan had no incentive to testify in this manner if it were not the truth, given his present relationship with TPI and the Bennetts.

of fact are based largely upon the testimony of Plaintiff's witnesses, which the Court found to be credible and reliable.

### III. Conclusions of Law

Counts I, II, and IX of the Plaintiff's Complaint seek damages from Defendant, TPI, under the terms of the Service Agreement (Plaintiff's Exhibit No. 3) and for breach of said agreement by the Defendant. As for Count I, the Court finds that the Plaintiff has proven by a preponderance of the evidence the following elements in support of his cause of action: [25]

1. A Service Agreement (contract) existed between Charles Holler, d/b/a TRI–C Advertising, and TPI. The agreement was not disputed by the Defendant, TPI, and Plaintiff's Exhibit No. 3 was stipulated to as an accurate copy of the agreement. Its admission into evidence was also agreed to by the parties.

2. From the date of execution of the Service Agreement, Charles Holler performed the services required of him, and he was willing to continue said services beyond September 1988, so long as he was allowed to do so in a legal, moral, and ethical way.

3. In September 1988, the Defendant, TPI, by and through its officers, Allen Bennett and Tina Bennett, caused a termination of the Service Agreement by their actions of requiring Charles Holler to continue performance in a manner which was impossible for Mr. Holler. By rendering performance impossible for Holler, the Defendant, TPI, breached the Service Agreement excusing further performance by Holler and entitling Holler to damages as a result of the breach.

4. As a result of the termination of the Service Agreement by Defendant, Paragraph 11 of the agreement came into effect entitling Holler, d/b/a TRI–C, to receive 5% of the gross revenues paid to TPI for two years following the termination.

5. Holler has received no monies from TPI since September 1988 despite demand for such.

6. The average gross monthly receipt for TPI during fiscal years 1988, 1989, and 1990, equalled $234,740 for a 24–month (2 year) total of $5,633,760, of which Holler is entitled to 5% or $281,688. Holler is also entitled to pre-judgment interest on this sum in the amount of $59,858, for a total due from Defendant, TPI, under Count I, of $341,546.

As for the first two elements proven by Plaintiff under Count I, little need be said. The existence of the Service Agreement was stipulated to as were its terms. There is no dispute that Charles Holler performed the services required of him under the agreement until September 1988. There is also no dispute that Holler would have continued performing under the agreement but for the conditions asserted by Defendant, TPI, through its officers. The only real dispute involves whether performance was actually made impossible by the Defendant, TPI, which leads the Court to discussion of the third element under Count I.

In finding in favor of Plaintiff on the third element of Count I, the Court relied upon the credible evidence presented by the Plaintiff. The Defendant, TPI, asserted that its actions had nothing to do with Holler's departure from TPI and that Holler merely decided to leave the business. Defendant further asserts that Holler did not give proper notice of termination under Paragraph 1 of the Service Agreement, and, as such, is not entitled to payment under Paragraph 11 of the agreement. The facts and the law do not support the Defendant's position. Factually, the Court found Plaintiff's version of the events surrounding Holler's departure from TPI to be accurate. Holler had no reason to leave TPI other than as he has stated. Holler was making a very good living with TPI for a high school dropout, and he was in the only business he had ever known. Allen Bennett knew that Holler would not continue at TPI unless the problems discussed above

---

**25.** In a breach of contract action where plaintiff contends that the defendant wrongfully terminated the contract, the plaintiff has the burden to prove, by a preponderance of the evidence, that the defendant improperly terminated plaintiff's right to proceed. *Friedman Electric Co. v. St. Clair County Housing Authority,* 23 Ill.App.2d 16, 161 N.E.2d 473 (1959).

were resolved, and it was to Bennett's advantage for Holler to leave.[26] Allen Bennett was set on keeping the gross revenues of TPI at a high level, and he made it clear to Holler that nothing could be done about the problems raised by Holler that would negatively affect those revenues. There is no question that Holler could not have continued to engage in conduct that was, at the very least, immoral and unethical after his "born again" experience, let alone be a part of anything that was illegal. Under these facts, the law clearly favors the Plaintiff.

 Under the case law of Illinois, it is clear that a duty is imposed upon a party not to interfere at all with performance by the opposite party. *Hansen v. Johnston,* 111 Ill.App.2d 88, 249 N.E.2d 133 (2nd Dist.1969). It is equally clear that when a contracting party renders performance impossible for the other party by his willful acts, the agreement is immediately breached excusing the nonacting party from further performance and giving rise to an action for damages by the aggrieved party. *Hansen, supra,* at 93, 249 N.E.2d 133; *Foreman State Trust and Savings Bank v. Tauber,* 348 Ill. 280, 180 N.E. 827 (1932); *Yale Development Co., Inc. v. Oak Park Trust and Savings Bank,* 26 Ill. App.3d 1015, 325 N.E.2d 418 (2nd Dist.1975); *Chicago Title & Trust Co. v. Hedges Mfg. Co.,* 91 Ill.App.3d 173, 46 Ill.Dec. 510, 414 N.E.2d 232 (2nd Dist.1980); and *Barrows v. Maco, Inc.,* 94 Ill.App.3d 959, 50 Ill.Dec. 526, 419 N.E.2d 634 (1st Dist.1981). The Defendant, TPI, argues that Holler did not properly terminate the contract under Paragraph 1, and, as such, the provisions of Paragraph 11 should not apply. The Court finds that Holler was not required to provide a notice of termination because the agreement had already been terminated by the Defendant's breach, thus excusing Holler from any further performance under the agreement. Paragraph 11 of the Service Agreement was drafted to protect Holler in the event of a termination for any reason, and, under the facts, the Defendant breached the agreement which gave rise to an immediate termination of the agreement and the immediate right of Holler to claim damages under the agreement. Paragraph 11 of the agreement is in essence a "liquidated damages" clause and the amounts proven under that paragraph are found to be the appropriate measure of damages for the Plaintiff.

 Having already addressed element 4 of Count I within the discussion of element 3, the Court turns to elements 5 and 6. The proof of element 5 of Count I is unquestionable in that there is no dispute that Charles Holler received no further monies from TPI following his departure, in 1988, which would apply toward payment under Paragraph 11 of the Service Agreement. As for element 6 of Count I, the Court finds that Paragraph 11 of the Service Agreement should control the measure of Plaintiff's damages and that said paragraph is unambiguous in its terms. As a result of the termination of the Service Agreement by Defendant's breach, Holler became entitled to 5% of the gross revenues paid to TPI for a period of 2 years following the termination. In proving the amount of damages, the Plaintiff is required to prove a reasonable basis upon which to compute the damages. *Bockman Printing & Services, Inc. v. Baldwin–Gregg, Inc.,* 213 Ill.App.3d 516, 157 Ill.Dec. 630, 572 N.E.2d 1094 (1991). The Plaintiff has proven a reasonable basis upon which damages can be computed from the use of Federal Income Tax Returns of TPI for the years in question. (Plaintiff's Exhibit No. 15). The Plaintiff has shown the average monthly gross revenue for the period in question to have been $234,740 for a 24 month (2 year) total gross revenue of $5,633,760. The Plaintiff's 5% share of these gross revenues equals $281,688. The Court further finds that the Plaintiff is entitled to prejudgment interest at the rate of 5% on this total equalling $59,858. 805 ILCS 205/2 (1992). In sum, the Court finds that judgment is proper for Plaintiff under Count I of the Complaint in the amount of $341,546.

26. The facts show that Charles Holler was never really replaced. Dave Jordan and Gerri Samson took over for Holler, but they didn't receive nearly the level of compensation that Holler had. Allen Bennett had learned the business and no longer needed Holler as long as the other experienced telemarketers remained, which they did.

In addressing Count II of the Plaintiff's Complaint, the Court finds that Plaintiff has not shown the elements necessary to sustain that Count. The Court has found that the parties' Service Agreement terminated on or about September 15, 1998, as a result of the Defendant's breach. To sustain an action under Count II, Plaintiff would have had to have shown that no termination occurred in September 1988, and that is not supported by either the law or the facts.

Under Count IX of the Complaint, the Court finds that the Plaintiff has proven, by a preponderance of the evidence, the following elements:

1. The existence and terms of the Service Agreement between the parties;

2. The amount of money which Charles Holler, d/b/a TRI-C, was to receive under the agreement for his services;

3. The amount of money Charles Holler actually received for his services while at TPI; and,

4. Underpayment of Charles Holler for services rendered to TPI.

The first element of Count IX is not disputed. There was clearly a Service Agreement between the parties and the terms of that agreement aren't in question. As with the first element, the second element is not disputed. Under the terms of the Service Agreement, dated September 7, 1985, Charles Holler was to receive:

> ... "50% of the net income of TPI computed and determined as follows: from the gross revenues of TPI attributable to TRI-C sales of advertising and placements, shall be excluded or deducted all amounts paid or retained by agents, independents, contractors, solicitors, or other persons or entities producing revenue by TPI at the request of TRI-C, and all ordinary and necessary expenses of TPI, including, but not limited to, its expenses directly paid or reimbursed to TRI-C with respect to TRI-C's expenses incurred in furtherance of its duties and responsibilities hereunder, and fee payable to the Lodge, and any expenses necessary to publish the periodical known as "The State Trooper." It is both parties' intention that said fee payable to TRI-C as provided in the paragraph in general be an amount equal to fifty-percent (50%) of the net income of TPI for federal income tax purposes.

Under this formula provided by the agreement, Plaintiff has shown that Holler should have been paid $252,067 for his services while at TPI.

The evidence concerning element 3 of Count IX shows that Charles Holler actually received the sum of $242,241 for his services to TPI for the period between September 1985 and September 1988. The computation of element 4 of Count IX simply involves subtraction of what Holler actually received in fees from what he was entitled to under the Service Agreement. Thus, $252,067 minus $242,241 equals $9,826 in underpayment to Charles Holler under Paragraph 9 of the parties' Service Agreement. The Court further finds that Holler is entitled to prejudgment interest at the rate of 5% pursuant to 805 ILCS 205/2 (1992) from September 1988 to the date of this ruling, in the amount of $2,948, for a total due to Plaintiff under Count IX of $12,774.

Counts III and IV of the Plaintiff's Complaint request an accounting by the Defendants to provide data to support the Plaintiff's claim for damages in Counts I and II of the Complaint. Through discovery, the Plaintiff has received sufficient data to formulate a reasonable basis upon which to calculate damages under Counts I and II of the Complaint. As such, Plaintiff has indicated that he is willing to accept a judgment based upon the data gained in discovery and that no accounting is necessary. The Court concurs in this assertion. The Court finds that the Plaintiff, having shown a reasonable basis from which to calculate damages, has no further need of an accounting and that an accounting would provide very little additional help. As such, Counts III and IV of the Plaintiff's Complaint will be denied.

Counts V through VIII of the Complaint concern the relationship of Carlinda Holler to Defendant, FCIA Marketing, Inc., and to Defendants, Allen Bennett and Tina Bennett. As set forth in the findings of fact, FCIA Marketing, Inc. was incorporated for the

purpose of fulfilling a professional fund raising contract with the Dale Corporation. The evidence indicates that the contract between FCIA Marketing, Inc. and the Dale Corporation was very lucrative and provided a consistent level of gross revenue from the inception of FCIA Marketing, Inc. in 1986. The evidence further indicates that, starting in 1986, Carlinda Holler received considerable sums of money from FCIA Marketing, Inc. which were designated as salary to Carlinda Holler, although the evidence indicates that Carlinda Holler never actually worked for FCIA Marketing, Inc., nor did she know much about the company. Although this money received by Carlinda Holler was designated as a salary, the Court finds that, in essence, these monies were dividends for her ownership interest in FCIA Marketing, Inc. given the fact that Carlinda Holler did not actually work for the company. In 1986, Carlinda Holler received the sum of $29,800 from FCIA Marketing, Inc. In 1987, Carlinda Holler received the sum of $20,449.11, for a two year average of $25,124.55. In 1988, evidence indicates that Carlinda Holler received the sum of $18,297.42, all of which was received prior to September 15, 1988. The evidence further indicates that, following Charles Holler's departure from TPI, Carlinda Holler received no further sums of money from FCIA Marketing, Inc. up and through the time of trial in this matter. As further set forth in the findings of fact above, in October 1988, a meeting of shareholders and directors of FCIA Marketing, Inc. was held, at which meeting the only persons present were Allen Bennett and Tina Bennett. At this meeting, Allen Bennett and Tina Bennett purportedly voted to have the remaining 4,000 shares in FCIA Marketing, Inc. transferred to Tina Bennett, thus increasing her ownership interest in the corporation from 55% to 91%. As further set forth above, the Court has found that the notice of this meeting of October 3, 1988, was not sent to Carlinda Holler. The evidence clearly indicates that the notice upon which the Defendants rely had an address on it which the Hollers would not live at until some five months after the date of the notice. This fact indicates that the notice in question was not prepared for at least five months after the date upon which it was supposedly sent. In all likelihood, the notice was prepared in preparation for the trial on this matter. As also stated above, the gross revenue of FCIA Marketing, Inc. remained fairly constant from its inception in 1986 through 1992, when, following the filing of the Complaint in this matter, the Defendants, Allen Bennett and Tina Bennett, caused the contract between FCIA Marketing, Inc. and Dale Corporation to be terminated with said contract being transferred to TPI for no apparent reason. Subsequent to 1992, it is apparent that TPI maintained the Dale Corporation in substantially the same manner as FCIA Marketing, Inc. had and that TPI remains in control of that contract to this point in time.

In Counts V and VI of the Complaint, Plaintiff alleges that FCIA Marketing, Inc., together with Allen Bennett and Tina Bennett, caused an overpayment of expenses to TPI through the contract between FCIA Marketing, Inc. and TPI (Plaintiff's Exhibit No. 14) for TPI to service the FCIA contract with the Dale Corporation. In ruling on Counts V and VI of the Plaintiff's Complaint, the Court finds that the Plaintiff has failed to meet his burden of proof in showing that there were overexpenditures by FCIA Marketing, Inc. to TPI. On this point, the Court finds that, while the Plaintiff has alleged and argued that FCIA Marketing, Inc., through Allen Bennett and Tina Bennett, paid more expenses to TPI than it owed, this argument is based upon an allocation factor derived by the Plaintiff which is of a questionable basis. In examining the arguments and the testimony by both Plaintiff's witnesses and the Defendants' witnesses, the Court finds that, in balance, the evidence as to a proper allocation figure supplied by the Defendants' witness, Wayne Lively, is as credible and as accurate as the one supplied by the Plaintiff's witnesses. As such, the Court is unable to find that the Plaintiff has met his burden of proof by a preponderance of the evidence to support a theory that FCIA Marketing, Inc. grossly overpaid expenses to TPI such that those amounts of money should be found to be the measure of damages due and owing to Plaintiff *via* Carlinda Holler. The Court finds that the Defendants' expert testimony

concerning the proper allocation figure for the expenses between FCIA Marketing, Inc. and TPI was properly based on the available data and that the approach of a man-month or man-hour type allocation factor asserted by the Plaintiff is only proper if you have accurate data under a time keeping system. Although the Court recognizes that the approach taken by the Plaintiff is an appropriate accounting approach, the Court finds that the data supplied by the Plaintiff is too speculative in that it is not based on an exact set of time records, but rather an estimate of Charles Holler as to the number of hours spent on projects between FCIA Marketing, Inc. and TPI. For all of these reasons, the Court finds that the relief requested by the Plaintiff in Counts V and VI of his Complaint must be denied.

■■■■■ Counts VII and VIII of the Plaintiff's Complaint concern the issuance of the 4,000 remaining shares of stock in FCIA Marketing, Inc. to Tina Bennett on October 3, 1988. As has been discussed above, the Court finds that this issuance of stock was not proper and was in contravention of Illinois Corporation Law, pursuant to 805 ILCS 5/8.25, in that Carlinda Holler, as a director, officer, and shareholder of FCIA Marketing, Inc., was not properly notified of the meeting at which time the vote was taken to issue the remaining 4,000 shares to Tina Bennett. As such, that meeting was not lawfully conducted. In fact, the Court finds that the meeting of October 3, 1988, was fraudulently conducted in that it is clear that Allen Bennett and Tina Bennett conspired to have this meeting and to issue the additional shares in FCIA Marketing, Inc. to Tina Bennett so as to essentially eliminate the ownership interest of Carlinda Holler without the knowledge of Mrs. Holler. It is clear that not only was Carlinda Holler not notified of the meeting, but the Defendants, Allen Bennett and Tina Bennett, took actions to hide their deceit. Under the law, it is clear that, as directors of FCIA Marketing, Inc., Allen Bennett and Tina Bennett owed a fiduciary duty to the stockholders, one of which was Carlinda Holler. The burden is upon the Defendants to show that as directors of FCIA Marketing, Inc. the transfer wherein they transferred 4,000 shares of stock to Tina Bennett was

one which was fair to the other stockholders. *See: O'Connell v. Pharmaco,* 143 Ill.App.3d 1061, 98 Ill.Dec. 154, 493 N.E.2d 1175 (4th Dist.1986), and *Romanik v. Lurie Home Supply Center,* 105 Ill.App.3d 1118, 61 Ill. Dec. 871, 435 N.E.2d 712 (4th Dist.1982). The Court finds that the Defendants not only have failed to show that their action in issuing 4,000 shares of stock to Tina Bennett without notice to Carlinda Holler was fair, but that the evidence has shown that this action was fraudulent. Under Illinois law, corporate directors have fiduciary duties of good faith, loyalty, and honesty to the corporation and to the shareholders of that corporation. As such, they cannot enhance their own personal interest at the expense of the corporation. *In re Dearborn Process Service, Inc.,* 149 B.R. 872 (Bankr.N.D.Ill.1993), and *Smith–Shrader Co., Inc. v. Smith,* 136 Ill.App.3d 571, 91 Ill.Dec. 1, 483 N.E.2d 283 (1st Dist.1985). Having found that Allen Bennett and Tina Bennett, directors of FCIA Marketing, Inc., have breached their fiduciary duty to the stockholders, namely Carlinda Holler, the Court finds that not only is FCIA Marketing, Inc. liable for damages caused to Carlinda Holler as a result of the transfer of said stock, but that Allen Bennett and Tina Bennett are also liable as directors of FCIA Marketing, Inc. in that they actively participated in and conspired to have the stock transferred for their own personal interests in direct contravention of the interests of Carlinda Holler.

In determining the damages under Counts VII and VIII of the Plaintiff's Complaint, the Court finds that the gross revenues of FCIA Marketing, Inc. were fairly constant from the inception of FCIA Marketing, Inc. through 1992, when the Dale Corporation contract was taken away from FCIA Marketing, Inc. The Court further finds that, from 1986 through 1988, Carlinda Holler received a substantial sum of money annually from FCIA Marketing, Inc. even though she did not do any work for that corporation in any cognizable manner. The payments made to Carlinda Holler in 1986, 1987, and 1988, appear to be in the nature of dividends for her ownership interest in FCIA Marketing, Inc. rather than salary as an employee of the

corporation. The Court finds that, based upon the data available, Carlinda Holler's average annual payment from FCIA Marketing, Inc. should have been $25,124.55, as is demonstrated by her two year average of 1986 and 1987. The evidence shows that, following Charles Holler's departure from TPI in September 1988, Carlinda Holler received no further sums of money from FCIA Marketing, Inc. The Court finds that the actions taken by Allen Bennett and Tina Bennett in the director and stockholder meeting of October 3, 1988, were void under Illinois law. As such, Carlinda Holler remains a 45% shareholder of FCIA Marketing, Inc. as of the date of this judgment. The Court finds that Carlinda Holler should have continued to receive an annual sum in an amount of approximately $25,124.55, in that the fortunes of FCIA Marketing, Inc. appear to have remained fairly constant from the period of its inception through the date of the termination of the Dale Corporation contract. The Court finds that damages should be assessed against FCIA Marketing, Inc. under Count VII of the Complaint and against Defendants, Allen Bennett and Tina Bennett, individually, under Count VIII of the Complaint as follows:

1. For the year 1988, Carlinda Holler should have received an additional $6,827.13.

2. For the year 1989, Carlinda Holler should have received the sum of $25,124.55.

3. For the year 1990, Carlinda Holler should have received the sum of $25,124.55.

4. For the years 1991 and 1992, the same sum of $25,124.55 should be awarded.

5. Additionally, the Court finds that the action taken by FCIA Marketing, Inc. and Allen Bennett and Tina Bennett in terminating the contract with Dale Corporation and transferring that to TPI, was void under the law. As such, the Court finds that for the years 1993 and 1994, Carlinda Holler should also receive the annual sum of $25,124.55, as her dividend from FCIA Marketing, Inc.

In sum, the Court finds that judgment should be entered for the Plaintiff on Count VII in the amount of $157,574.43 and on Count VIII against the Defendants, Allen Bennett and Mary K. (Tina) Bennett, individ-

ually, also in the amount of $157,574.43. The Court also notes that, given the fact that the attempt to transfer 4,000 shares to Tina Bennett was void under Illinois law and that also the termination of the Dale Corporation contract with FCIA Marketing, Inc. was void, as of this point in time, Carlinda Holler remains a 45% shareholder in FCIA Marketing, Inc. and that continuing liability for the transfer of the Dale Corporation contract may exist beyond the date of this judgment.

Finally, the Court addresses the question of attorney's fees which have been requested by the Plaintiff. As for this question, the Court finds that the award of damages under Counts VII and VIII of Plaintiff's Complaint arise from a situation in which allowance of attorney's fees for the Plaintiff together with costs would support the granting of attorney's fees. Additionally, the Court finds that the character of the judgment entered against Defendant, TPI, in Counts I and IX of Plaintiff's case also supports the award of attorney's fees and costs to the Plaintiff pursuant to the authority of 735 ILCS 5/5–108. As such, the Court finds that the judgments against the various Defendants shall include reasonable attorney's fees for Plaintiff's attorney together with the costs of suit.

## ORDER

For the reasons set forth in an Opinion entered on the 4 day of October 1994;

IT IS HEREBY ORDERED that:

A. Judgment is entered in favor of Plaintiff on Count I of Plaintiff's Complaint in the amount of $341,546;

B. Count II of Plaintiff's Complaint is *DENIED*;

C. Count III of Plaintiff's Complaint is *DENIED*;

D. Count IV of Plaintiff's Complaint is *DENIED*;

E. Count V of Plaintiff's Complaint is *DENIED*;

F. Count VI of Plaintiff's Complaint is *DENIED*;

G. Judgment is entered in favor of Plaintiff on Count VII of Plaintiff's Complaint in the amount of $157,574.43;

H. Judgment is entered in favor of Plaintiff on Count VIII of Plaintiff's Complaint in the amount of $157,574.43;

I. Judgment is entered in favor of Plaintiff on Count IX of Plaintiff's Complaint in the amount of $12,774; and,

J. Plaintiff is awarded reasonable attorney's fees and costs of this suit.